PHILLIP S. FRY and K. SUSAN FRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fry v. Commissioner
Docket No. 46185-86
United States Tax Court
T.C. Memo 1991-51; 1991 Tax Ct. Memo LEXIS 76; 61 T.C.M. (CCH) 1812; T.C.M. (RIA) 91051; February 11, 1991, Filed *76 Decision will be entered under Rule 155. Phillip S. Fry, pro se. [1]
David W. Otto and S. Mark Barnes, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDING OF FACTS AND OPINION Respondent determined deficiencies in and additions to petitioners' joint Federal income taxes as follows: Additions to Tax Year
Deficiency
Section 6653(b) [2]
Section 6654(a)
1977
$ 108,999.00
$ 54,499.50
$ 3,878.57
1978
604,924.70
302,462.35
19,311.18
1979
1,102,594.23
551,297.12
46,092.03
Respondent determined a separate deficiency of $ 2,436,382.86 and additions *77 to tax under sections 6653(b) and 6654(a) of $ 1,218,191.43 and $ 155,234.30, respectively, in petitioner Phillip S. Fry's Federal income taxes for 1980. After concessions by the parties, the issues remaining for decision are: (1) Whether petitioners failed to report substantial amounts of gross receipts during the years in issue; (2) whether petitioners are entitled to expense deductions in excess of those respondent allowed; (3) whether petitioners are liable for the addition to tax for fraud under section 6653(b); (4) whether assessments of deficiencies and additions to tax for the years in issue are barred by the statute of limitations; (5) whether petitioners are liable for self-employment taxes pursuant to sections 1401 et seq.; and (6) whether petitioners are liable for an addition to tax for failure to make estimated tax payments under section 6654(a). For clarity and convenience we have combined, in major part, our findings of fact and opinion herein because of the mass of financial and documentary data contained in the record. GENERAL AND BACKGROUND FACTS
Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are *78 incorporated herein by this reference. Petitioners resided in Mesa, Arizona, at the time they filed their petition in this case. Petitioners conducted business during the years 1977, 1978, 1979, and 1980 through an organization called Tax Information Center (TIC), which may appropriately be described as an income tax, estate planning, and financial consulting firm. TIC operated as Mr. Fry's sole proprietorship and was headquartered in buildings on part of 120 acres of land petitioners owned near New Concord, Ohio. [3] By 1980 petitioners were successful in soliciting a nationwide clientele of over 1,000 clients for TIC's tax return preparation practice. Mr. Fry graduated from Case Western Reserve with a degree in economics. He also attended law school classes at the University of Akron and Georgetown University *79 Law Center, and he has taken courses toward earning a masters of business administration at George Washington University. However, he has not received a graduate degree from any of these institutions. Throughout his education, Mr. Fry never enrolled in a course involving Federal income taxation. Even so, he was variously identified in TIC promotional materials as "one of the nation's most creative year-round income tax and estate planning specialists"; a "tax accountant and multi-millionaire"; a "highly eloquent lecturer who has explained our nation's complicated tax laws in everyday, easy to understand words"; a "leading tax consultant"; and a "multi-millionaire tax specialist." TIC marketed its services through an aggressive self-promotion campaign featuring free seminars at which Mr. Fry was the featured speaker. Petitioners scheduled seminar dates at motels or hotels in various towns and cities and promoted them through advertisements in local newspapers. The newspaper advertisements announced that Mr. Fry, as a noted tax expert, would be speaking on the subjects of tax savings and financial planning. In addition, he would appear on local talk shows to discuss theories *80 of taxation and estate planning and to further publicize the upcoming seminar. During the seminars, Mr. Fry described the tax burden borne by the average wage-earning taxpayers and self-employed people. He identified the benefits available through the use of estate planning devices, particularly involving revocable trusts, and promoted TIC's services to the audience. Mr. Fry conducted interviews after the seminars where he and his confederates sought to contract with individuals for TIC's services. He also offered books and other publications he had written for sale through another Fry-owned entity, "Let the People Know" Law Book Store. Mr. Fry authored books with the following titles and copyright dates: "How to Disinherit the IRS & Probate Court" (copyright 1973, 1975, 1977, 1978 and 1979); "Pay No Income Tax Without Going to Jail" [4] *81 (copyright 1975 and 1978); "How to Cut Your Taxes in Half By Incorporating Your Job or Business" (copyright 1976 and 1978); "Our Lady of Perpetual Deductions" (copyright 1977); and "Blood Taxes at Harvest Time" (copyright 1977). [5]
Individuals interested in TIC's services signed a formal agreement as to the scope of services to be provided and the fee charged. [6] The client fee was calculated on the financial condition of the particular client and was paid in cash or by credit card at the time of signing the TIC Agreement. Prospects were officially considered TIC's clients after signing the agreement. TIC created at least 14 regional franchises staffed by sales representatives for the promotion and sale of TIC's services. Mr. Fry sold one TIC franchise for $ 25,000. Sales representatives *82 received a percentage of the fees collected from TIC clients solicited by the representative. Mrs. Fry attended high school through the eleventh grade, but has a general equivalency degree (ged). She worked with Mr. Fry at TIC from its inception through 1980 and was described as TIC's business manager and publicity director. However, she received no direct compensation for her services to TIC during the years in issue. Her duties included assisting in the preparation and maintenance of internal books and records. Petitioners made a practice of opening a separate bank checking account for most of the entities (or trusts) they created, and each had signatory authority on the checking accounts they established. Mrs. Fry was in charge of overseeing the banking transactions in each checking account of petitioners' enterprises. The deposits were handled by Mrs. Fry or TIC office personnel under her supervision. Mrs. Fry prepared the checks and she signed the majority of them, often at her husband's direction. During 1977 through 1980, Mrs. Fry signed thousands of checks drawn on accounts for TIC and other entities petitioners controlled. TIC was the nucleus of petitioners' operations. *83 However, during 1977 through 1980, petitioners also conducted various other business activities and promotions through subentities. As previously alluded to, "Let the People Know" Law Book Store (LBS) was a clearinghouse for books and publications authored by Mr. Fry. Petitioners created Orlando Advertising to obtain advertising agency discounts for their promotion of TIC. [7] Mr. Fry used the name "William Carlson" and Mrs. Fry used the name "Kathy Orlando" when conducting business through the agency. Petitioners created Family Health & Improvement Society (FHIS) in the form of a trust. FHIS operated as a mail order ministry whereby clients of TIC had the opportunity to form their own church as a tax avoidance device. As an adjunct to FHIS, petitioners created a legal services plan to benefit the members of FHIS and named it Group Legal Plan (GLP). Whenever trusts were prepared for TIC clients, the trusts were prepared by GLP attorneys. *84 GLP attorneys were independent lawyers practicing in Pennsylvania and Arizona who were paid for their services through TIC. [8]
FRY FAMILY TRUSTS
In 1973 Mr. Fry formed the Fry Family Trust, a grantor trust. In 1976 petitioners formed a second grantor trust as a successor to the Fry Family Trust called the MLJ Trust. The two trust documents are identical except for the name of the trust created. Mr. Fry was the trustee and sole income beneficiary of the Fry Family Trust and the MLJ Trust. Mrs. Fry was the *85 successor trustee for both trusts. In 1977 and the years that followed, petitioners used the MLJ Trust exclusively. SYNDICATED TRUSTS
Beginning in 1978, petitioners encouraged investors and clients of TIC to invest in Precious Metals Holding Company, a Trust (Precious Metals). Precious Metals was designed to be an investment vehicle for Mr. Fry and certain of his clients. Mr. Fry served as the trustee of the Precious Metals trust. By 1979, petitioners began to actively prepare and present other investment opportunities to TIC clients. [9] Eight syndicated trusts were organized and participations sold to TIC investors in 1979. Most of these syndicated trusts involved an investment in mobile home parks around the United States. In 1980, eight additional syndications were formed and sold by Mr. Fry, each taking the form of a trust. The syndications existing and marketed to clients during 1979 and 1980 were as follows: 1979 1980 Precious Metals Holding
Capital Appreciation Trust
Co., A Trust (1978)
Columbus Game Arcade, A Trust
Casa Serena Trust I
Energy Lodging Trust
Casa Serena Trust II
Innovative Investors Trust
Central Ohio Trust #1
Jordan Estates, A Trust
Hamilton Road Partnership,
Fantasyland Trust I
A Trust (1978)
Orchard Lakes Estates Trust
La Oficina Trust
Sports Paradise Recreational
Lake Estates, A Trust
Vehicle Park, A Trust
Lake Middlebourne Estates,
A Trust Tall Timbers Trust
Tradewinds Trust
*86 For each syndicated investment project marketed by Mr. Fry, a trust was formed making him the sole trustee. A master trust agreement was created specifying the rights of the parties, a copy of which was signed by and given to each investor. For each syndication approximately 20 to 30 duplicate original trust documents existed. Each trust operated in a manner identical to that of a limited partnership, with Mr. Fry as the general partner and the investors providing the money as limited partners insulated from liability and from authority to make decisions on behalf of the enterprise. Separate bank accounts were opened for each syndicated trust with Mr. and Mrs. Fry the authorized signatories. In almost every syndicated trust he established, Mr. Fry obtained a specified portion of beneficial interest in exchange for past and future *87 services. Some of the trust agreements also provided for consulting or managing fees to be paid to Mr. Fry in addition to the beneficial interests allocated to him. The amount of beneficial interest obtained and management fees varied among the trust agreements. The MLJ Trust nominally owned the beneficial interests obtained by Mr. Fry. The size of the syndicated offerings ranged from $ 100,000 to $ 1,520,000 The capital solicited from investors was applied as the down payment on properties to be owned and operated by the syndication. In some cases a portion of the solicited capital was also applied as payment of Mr. Fry's one-time management, consulting, or organizational fee. As a rule, petitioners never made any cash payments or contribution to any syndicated activity in exchange for receipt of the beneficial interest from any syndicated activity. Investment opportunities usually were heavily tax advantaged. Each syndicated trust was heavily promoted by Mr. Fry to TIC clients. He used the name "Positive Cash Flow Network" as a marketing strategem for eliciting investments in the syndications. The advertisements were often glowing in terms of the profit prospects of the *88 particular syndication. For 1979 and 1980, however, all fiduciary income tax returns (Forms 1041) filed by Mr. Fry for each of the syndicated entities reflected a loss from operations. Petitioners provided their accountant Ronald Snook (Mr. Snook) with information on the income and expenses of each of the syndications for which Mr. Fry was trustee. Mr. Snook took the information provided by Mr. Fry and prepared income statements and balance sheets as well as drafts of fiduciary income tax returns. Petitioners, rather than original documents, were the source of information for the majority of fiduciary returns that were filed for the syndicated entities. FREEDOM FUEL CORPORATION
In 1979 petitioners incorporated Freedom Fuel Corporation (FFC). Mr. Fry organized FFC in response to the oil crisis of the late 1970's with the stated purpose "to locate, find, and develop any and all forms of energy." Even though FFC never filed an election to be treated as an S corporation, Mr. Fry filed the FFC returns on Form 1120-S. An investor with FFC would buy a distributorship, paying no cash or a variable small down payment and sign a 30-year recourse promissory note. The fee for the *89 license was $ 20,000 in 1979 and $ 25,000 in 1980. In exchange, the investor received a license agreement expiring December 31 of the year of issuance. The license gave the investor the right to distribute gasohol and any other products of FFC within the distributorship area granted to the investor. Gasohol production facilities were never constructed by FFC nor was any gasohol produced or made available to those who held FFC distributorship licenses. The products made available to FFC licensees consisted of compressed coal bricks, blue prints for alcohol stills and an energy efficient home, booklets, pamphlets, and hydrometers to measure alcohol and sugar concentration in the distillation process. In 1979, FFC materials advertised that an 8 to 1 tax writeoff was available to the investor who paid $ 2,500 down and signed a recourse promissory note for a total investment of $ 20,000. Many of the distributorships were sold to investors late in December 1979 and 1980 giving the investor only a few days on his annual license agreement. Renewal of the license required signing another promissory note. Petitioners or their agents on at least one occasion backdated a license agreement *90 to generate additional deductions for a client even though the end of the taxable year had passed. FFC issued foreign and domestic licenses for the distribution of FFC products. The representation contained in each license agreement was that the license was exclusive. However, there was no rhyme or reason behind the selection of geographic areas of the foreign or domestic licenses. The same geographic areas were often sold several times to the same or different investors for the same year. It was not unusual for petitioners to sell a license agreement with no geographic area designated. In addition, FFC licenses were granted to ten of the syndicated trusts increasing the losses claimed by the trusts for 1979 and 1980. The syndicated trust entities and FFC distribution fees included in the claimed losses are as follows: Number of FFC DEDUCTION TRUST
Distributorships
1979 1980 La Oficina
3
$ 60,000 0
Lake Estates
12
$ 240,000 0
Central Ohio #1
12
$ 240,000 0
Casa Serena I
5
$ 100,000 0
Casa Serena I & II
9 0
$ 225,000
Jordan Estates
6 0
$ 150,000
Sports Paradise RV Park
1 0
$ 25,000
Capital Appreciation
7 0
$ 175,000
Energy Lodging
5 0
$ 125,000
Fantasyland
12 0
$ 300,000
Total
72
$ 640,000
$ 1,000,000
*91 In 1986 Mr. Fry was indicted by a Federal grand jury on a 17-count indictment relating to his control and marketing of FFC franchises. He pled guilty to the first count of the indictment which charged him with criminal "conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful Government functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of income taxes." The relevant factual allegations contained in the first count of the indictment charged that Mr. Fry induced individuals to purchase FFC distributorships by promising tax deductions in excess of the required investment. The FFC distributorship purchases were financed by a small down payment, or no down payment, with the balance secured by a 30-year recourse promissory note which Mr. Fry represented would not be handled as a legal enforceable obligation. He used FFC to create tax deductions and prepared tax returns for individuals claiming the FFC deductions in them which served to defraud the United States. LEVERAGE LEASING CORPORATION
Mr. Fry formed Leverage Leasing Corporation (LLC) in 1979 to aid him in obtaining money from *92 investors. Investors "deposited" cash and were promised a return of interest at money market rates. Mr. Fry loaned the cash obtained from investors to other Fry controlled entities suffering a cash flow deficit. In essence LLC operated as Mr. Fry's personal loan company. PERSONAL FILING HISTORY
Petitioners filed their 1974 and 1975 joint Federal income tax returns on September 10, 1979. They listed "financial planner" as their occupations and reported a loss of $ 17,510 and $ 2,080 on their 1974 and 1975 returns, respectively. Petitioners filed their 1976 joint Federal income tax return on June 24, 1977, reporting a $ 39,784 loss. Mr. Fry's occupation was listed as "business owner" and Mrs. Fry's occupation was listed as "housewife." Petitioners entered into a stipulated decision in a previously docketed case in this Court regarding their 1974, 1975, and 1976 taxable years. They agreed they had understated their tax liabilities, without regard to any additions to tax, in the amounts of $ 2,893.31, $ 10,701.75, and $ 740.47, respectively. Petitioners filed their 1977 joint Federal income tax return on December 27, 1978. They filed their 1978 and 1979 joint returns on *93 September 18, 1980. They did not file a return for 1980. They listed "financial planner" as their occupation on the returns they filed. They did not make estimated tax payments or pay any self-employment taxes for any of the years at issue. The entries on the returns regarding income are as follows: Form 1040 Line Description
1977 1978 1979
Capital gain (loss)
$ (487.00)
Pensions, annuities, rents,
partnerships, estates,
trusts, etc.
$ (18,451.00)
168,920.00 (422,119.00)
Net operating loss carryforward
(60,615.00)
Taxable income 0
107,818.00  0 Tax liability 0
21,605.00  0 Investment tax credit
$ 5,212.00  21,605.00 Tax due 0 0 0 The most significant entry on petitioners' returns for all years is the loss from partnerships and fiduciaries traceable to the MLJ Trust tax returns. The MLJ Trust returns reported the following: Item Description
1977
1978 1979 Income (loss) from partnerships [10]
$ (5,819)
$ (4,130)
$    3,765 Income (loss) from fiduciaries
(68,158)
(512,961)
Gross profit from trade or business
25,340 0  0  Net capital gain (loss)
1,400 (974) 0  Business loss carryforward
(38,786)
0  0  Interest income
150 0  0  Other income
0  267,083 88,596 Charitable contribution
(736)
(25,875)
0  Interest expense
0  0  (1,039)
Tax expense
0  0  (480)
Total
$ (18,451)
$ (167,946)
$ (422,119)
*94 THE AUDIT
Petitioners treated the majority of the persons performing services for their businesses as independent contractors rather than as employees for Federal tax purposes. An individual who expected to receive a Form W-2, but did not, complained to the IRS. In May 1977 Revenue Agent Olin Melaragno was assigned to investigate the complaint. He sent a letter to Mr. Fry scheduling an interview. Two or three days before the interview, Mr. Fry's secretary called Mr. Melaragno and cancelled the appointment. During a telephone conversation two months later, Mr. Fry stated that he "would not respond to any efforts to provide [Agent Melaragno] with any information related to any tax matters [Fry] might have." Thereafter, Mr. Melaragno requested a routine computer search of petitioners' income tax returns which revealed that, at that time, petitioners had not filed returns for their 1974, 1975, and *95 1976 tax years. He then changed the scope of his examination from employment tax to income tax liability. In September 1977 Mr. Melaragno again contacted Mr. Fry who told him again that he would not cooperate with any IRS investigation. Mr. Melaragno then received approval to resort to indirect methods of determining petitioners' income after discussing Mr. Fry's noncooperative attitude with his supervisors. Mr. Melaragno first attempted to use the net worth method to verify petitioners' income tax liability. However, that approach proved unsuccessful because he was not sure that he had all the information necessary to calculate a beginning net worth. Accordingly, he resorted to the bank deposits method to verify petitioners' correct income. On July 9, 1980, Mr. Melaragno informed petitioners by mail that he was expanding his examination to include their 1977 and 1978 income tax returns. He scheduled an interview and requested petitioners produce their books and records to support their 1977 and 1978 tax returns. Petitioners refused the request. On October 9, 1980, Mr. Melaragno informed petitioners by mail that he was expanding his examination to include their 1979 income *96 tax liability. He scheduled another interview and requested petitioners bring their books and records to support their 1979 return. He made a second request for petitioners to produce their records for their 1977 and 1978 tax returns. Petitioners refused all requests and failed to cooperate. Mr. Melaragno then transferred the case to the Criminal Investigation Division of the IRS. Special Agent Dennis O'Dell was assigned to the investigation and Mr. Melaragno continued to assist him. In an effort to determine petitioners' income from 1977 through 1980, Agent Melaragno and Special Agent O'Dell were required to reconstruct petitioners' income through third party records. Mr. O'Dell compiled a list of entities that appeared to be related to Mr. Fry or through which he conducted business. Mr. Melaragno surveyed banks located near petitioners' home and surrounding areas to locate their bank accounts. On September 9, 1981, Mr. O'Dell visited a TIC promotional seminar in Cleveland, Ohio, and served Mr. Fry with 56 summonses calling for the production of books and records for petitioners' businesses. Included were summonses for records of TIC, Leverage Leasing, and FFC. Summons *97 enforcement proceedings ensued in the United States District Court after Mr. Fry failed to comply with the summonses served by Mr. O'Dell. The summons enforcement proceedings for the 1977, 1978, and 1979 tax years commenced as early as March 9, 1982, and continued into 1983. Mr. O'Dell caused summonses to be served upon TIC clients, Mr. Fry's marketing associates, brokerage houses with whom Mr. Fry did business, and banks where petitioners had checking accounts. Mr. Fry instructed the banks not to comply with the summonses and summons enforcement proceedings were required to obtain compliance. Frequently, Mr. Fry instructed other summoned parties not to comply with the summonses and additional summons enforcement proceedings ensued. Mr. Melaragno eventually received the summoned third party records, and found that some of the bank records were not available or not readable. The banks were missing statements and other documentation. When Agents Melaragno and O'Dell analyzed the bank records received from the Quaker City National Bank, they discovered that many checks had been written in an ink that did not photocopy. Petitioners' use of "nonphotocopyable" ink hindered the investigation. *98 Nevertheless, upon receiving the incomplete information from the banks, Mr. Melaragno began looking for items of deposits in the various accounts. He listed all of petitioners' deposits that he was able to verify from the bank documents on his worksheets. He included in his analysis only those items of income that he could establish by the documents he was able to obtain. After listing all of the deposit amounts, Mr. Melaragno traced items which he believed were nontaxable transfers (such as transfers, loans, inheritances, and gifts) from other nonsyndication bank accounts, [11] and reduced the deposit amounts by these to arrive at petitioners' income. Thus, Mr. Melaragno's bank deposits analysis included only nonsyndication accounts for which petitioners were the signatories and nontaxable items were excluded from the analysis to the extent they could be identified. The income determined, as shown in the table on the following page, served as the basis for the statutory notice of deficiency. *99 Account
Holder
1977
1978
1979
1980
TIC, Inc. (QCNB)
$ 104,197.57
$ 991,950.90
$ 1,487,302.76
$ 882,550.71
MLJ Trust
7,347.70
100,297.03
88,389.31
956,672.15
Orl. Adv.
13,218.52
6,716.98
19,565.14
58,835.07
Fam. H & I.S.
5,769.85
19,901.00
27,222.50
17,678.06
Law Book Store
104,092.15
80,570.50
10,405.20
0.00
Talk Magazine
750.50
0.00
0.00
0.00
Energy Store
1,900.00
0.00
0.00
0.00
Discount Development
286.95
0.00
0.00
0.00
LBS0 (QCNB)
16.75
0.00
0.00
0.00
Phillip Fry
0.00
10,000.00
0.00
0.00
GLP
0.00
2,000.00
5,464.44
27,454.41
TIC (BONB)
0.00
0.00
40,126.02
58,018.90
TIC (VNB)
0.00
0.00
939.30
18,980.00
TIC Office Account
0.00
0.00
51,016.68
38,333.84
Guernsey Lumber
0.00
0.00
0.00
96,203.30
MLJ/Merrill Lynch
0.00
0.00
0.00
705,029.97
Amusement Concepts
0.00
0.00
0.00
42,500.00
Increasing Innovative
Income Magazine
0.00
0.00
0.00
22,547.53
Cashier's Checks
1,000.00
19,222.00
496,691.10
131,325.16
Total Deposits
$ 238,579.99
$ 1,230,658.41
$ 2,227,122.45
$ 3,056,129.16
Plus interest
0.00
0.00
0.00
10,284.00
Income
$ 238,579.99
$ 1,230,658.41
$ 2,227,122.45
$ 3,066,413.16
*100 Throughout the course of Mr. Melaragno's investigation, which lasted from May of 1977 until May of 1984, petitioners refused to cooperate in the investigation of their income tax liability. [12] Because of petitioners' refusal to cooperate, business expenses were not available to be examined, and were neither identified or subtracted from their income determined in the notice of deficiency. This modified bank deposits approach was used because without cooperation from petitioners, respondent could not make an accurate determination of their business expenses. UNREPORTED GROSS RECEIPTS
The focal point of this case centers around respondent's bank deposit schedules on which his notices of deficiency are based. Petitioners have adopted the deposit information contained in them *101 to prepare their own income schedules in their attempt to illustrate nontaxable deposits. Mrs. Fry prepared and petitioners submitted summary schedules purporting to show transfers between their related entities and syndicated entities they controlled. They attached cancelled checks and check stubs for some, but not all, of the transfers they claim in their schedules. We have ignored the check stubs because they lack third party verification of the amount and existence of payment. Furthermore, petitioners have not established that their internal accounting controls are adequate to rely on the check stubs as sufficient competent evidence of payment. In addition, we find that petitioners' schedules are unreliable because of the unsubstantiated transfers and obvious errors contained therein. For example, several of their schedules include checks claimed as nontaxable transfers that are not included in respondent's deposit schedules. We have disregarded these claimed nontaxable transfers because they were not previously included in petitioners' income. Treating them as nontaxable transfers will result in a double exclusion of income. Some of petitioners' other schedules misrepresent *102 the source of deposits. [13]
Respondent's schedules are not without error and respondent concedes that additional transfers should be removed due to evidence presented at trial. Rather than examine each check and each deposit schedule, and point out each error made by both parties, we have traced the checks petitioners submitted, which are listed in appendix B, to the deposit information contained in the relevant deposit schedules, which are listed in appendix C. We have grouped the deposits by source for *103 those bank accounts with disputed transfers and discuss them, infra, according to tables we have compiled for each separate year. However, some preliminary considerations apply to all years in issue. Petitioners make the blanket assertion that all of the funds transferred were "transfers and loans," and are therefore nontaxable receipts. They appear to be laboring under the misconception that merely because funds were transferred from a syndicated entity to a nonsyndicated entity they controlled, the transfer is a nontaxable receipt of funds. This view is too simplistic and ignores the purpose for the transfer. The checks petitioners submitted prove only the source of deposits and the amount transferred, not the purpose for the transfer. They must further prove that the receipt of the funds is nontaxable by the purpose of the transfer. Petitioners rely heavily on their testimony that the interaccount transfers are loans. We need not, and do not, accept such self-serving testimony without substantiating documentation. Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. a Memorandum Opinion of this Court. Although loans qualify transfers as nontaxable *104 receipts of funds, the evidence presented clearly contradicts the assertion that all of the transfers were loans. Although not conclusive, bank deposits are prima facie evidence of income and respondent need not prove a likely source of that income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Respondent has nevertheless shown client fees to be the likely source of petitioners' deposits. Furthermore, we note that most of the unexplained deposits on respondent's deposit schedules are regular and in odd dollar amounts. Receipts of this type have a business appearance. See United States v. Esser, 520 F.2d 213, 217 (7th Cir. 1975); United States v. Procario, 356 F.2d 614, 618 (2d Cir. 1966). Thus, we conclude that all deposits with an undocumented source are taxable gross receipts. Respondent treated deposits to the TIC, TIC Office Account, Orlando Advertising, Family Health & Improvement Society, Group Legal Plan, and MLJ Trust bank accounts as taxable gross receipts in his notice of *105 deficiency. In theory, transfers between these entities must be excluded from the total deposits to prevent double inclusion of income; once for the original deposit and secondly for the transfer. This theory breaks down in the case where, for example, one entity transfers funds to another and claims the transfer as a business expense. The second entity then claims the funds received as a nontaxable transfer when in reality it is a payment for goods and services and thus taxable income to the second entity. In this scenario, petitioners receive a double deduction for the same expense. At the risk of allowing petitioners a double deduction, we find that the identified transfers between petitioners' wholly owned entities are nontaxable transfers. The risk of allowing double deductions is minimal because respondent disallowed business deductions for the transfers. Petitioners argue that Family Health and Improvement Society (FHIS) and Group Legal Plan (GLP) bank account deposits should not be included in their income because they are separate entities. Petitioners did not file tax returns for either FHIS or GLP. Membership in FHIS was "free" upon signing the TIC client agreement. *106 See appendix A, par. 1. The client contract contained a provision which permitted the client to be represented by an attorney from the Group Legal Plan of FHIS. See appendix A, par. 1. The GLP lawyers were paid by TIC to do tax planning, drafting of revocable trusts for estate planning purposes, and client representation before the IRS in the event TIC planning was challenged. TIC clients received tax advice from GLP attorneys and were required to implement at least 90 percent of GLP tax planning suggestions to be covered under TIC's ten-times-money-back guarantee of results. Appendix A, par. 3. We doubt FHIS and GLP would have independent existence without TIC's support. Further, we find the testimony that people other than TIC clients were members of FHIS highly suspect. By petitioners' failure to introduce testimony of even one member of FHIS who was not a TIC client, we infer that there were none. Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Moreover, *107 the Government is not required to apply the tax laws in accordance with the form employed by the taxpayer where that form is a sham or is inconsistent with economic reality. Higgins v. Smith, 308 U.S. 473, 477, 84 L. Ed. 406, 60 S. Ct. 355 (1940). Where the form of the transaction has not, in fact, altered any cognizable economic relationships, that form will be ignored and the law will be applied according to the substance of the transaction. Markosian v. Commissioner, 73 T.C. 1235 (1980). Notwithstanding the formal documents filed with the State of Ohio, we find that FHIS and GLP were integrated and interrelated into TIC's operations to the extent that their separate existence is a sham. To conclude otherwise would exalt form over economic substance. Accordingly, we hold that respondent properly included the FHIS and GLP bank accounts in determining petitioners' income. A fundamental principle of income tax law is that taxable income is computed on the basis of an annual accounting period. Burnet v. Sanford & Brooks, 282 U.S. 359, 75 L. Ed. 383, 51 S. Ct. 150 (1931). Accordingly, we discuss each year separately. 1977
The following table categorizes petitioners' bank *108 deposits for 1977. BANK ACCOUNTS Deposit
MLJ Trust TIC LBS Orl. Adv.
Total Source:
Undocumented
$ 7,227.70
$ 103,612.57
$ 103,994.15
$ 2,057.52
$ 216,891.94
TIC (QCNB)
20.00
--
--
3,880.00
3,900.00
LBS
(Central)
100.00
585.00
--
7,281.00
7,966.00
Orlando Adv.
--
--
110.00
--
110.00
Total
Deposits
$ 7,347.70
$ 104,197.57
$ 104,104.15
$ 13,218.52
$ 228,867.94
Petitioners have failed to introduce any evidence of transfers into the following bank accounts and are deemed to have conceded, under Rule 142(a), that the following deposits represent taxable income (See table, supra p. 20.): Bank Account
Family Health & Improvement Society
$ 5,769.85
Energy Store
1,900.00
Discount Development/(Quickprint)
286.95
Law Book Store (QCNB)
16.75
Talk Magazine
750.50
Total
$ 8,724.05
Petitioners also failed to present any documentary evidence for the source of the single cashier's check in the amount of $ 1,000.00 made out to "Phillip Fry" that is included in respondent's bank account analysis. See infra p. 72. The purpose for which the check was drawn is also not proved by petitioners. Thus, we find the cashier's *109 check represents income. The undocumented deposits ($ 216,891.94), uncontested bank deposits ($ 8,724.05), and cashier's check ($ 1,000.00) total $ 226,615.99. Based upon the foregoing, we find petitioners received $ 226,615.99 in taxable gross receipts during 1977. 1978
After tracing the checks to respondent's schedules, we find the following to be the sources of 1978 deposits in petitioners' bank accounts. BANK ACCOUNTS
Deposit Source:
Orlando Adv
FHIS MLJ Trust Undocumented
$ 6,363.79
$ 16,001.00
$ 16,898.80
TIC (QCNB)
12,400.00
3,900.00
3,498.50
FHIS
450.00 - -
1,300.00
LBS
3,960.00 - -
170.00
MLJ Trust - - - - - -
Lake Middlebourne - - - -
79,950.00
Phillip Fry - - - - - -
Total
$ 23,173.79
$ 19,901.00
$ 101,817.30
Deposit Source:
TIC Total Undocumented
$ 975,308.62
$ 1,014,572.21
TIC (QCNB) - -
19,798.50
FHIS - -
1,750.00
LBS - -
4,130.00
MLJ Trust
13,000.00
13,000.00
Lake Middlebourne - -
79,950.00
Phillip Fry
9,950.00
9,950.00
Total
$ 998,258.62
$ 1,143,150.71
The undocumented deposits constitute taxable gross receipts to petitioners. The deposits with TIC (QCNB), FHIS, LBS, *110 and MLJ Trust listed as their source are considered nontaxable transfers to prevent double inclusion of income. The deposit from Lake Middlebourne was in payment of a ground lease and constitutes gross rental receipts to petitioners. Sec. 61; sec. 1.61-8, Income Tax Regs.
The deposit schedules for Phillip Fry's account show that $ 500.00 was deposited in that account on October 10, 1978, and $ 1.50 was deposited on December 13, 1978. Respondent's schedules do not contain the balance in that account at the beginning of the year. Petitioners have not offered any evidence of the account balance at the beginning of 1978. Appendix B item numbers 105-1 and 105-2 comprise the transfers listed above from Phillip Fry's account to TIC's bank account. These two checks were honored by the bank on October 10, 1978, and October 20, 1978, respectively. Conceivably, the October 10, 1978, deposit of $ 500.00 could have been paid out as part of the check listed as appendix B item number 105-1. Because the other deposit in the amount of $ 1.50 was made after the checks were honored, we find there were deposits of at least $ 9,451.50 into Phillip Fry's account. Petitioners have not documented *111 the source for deposits into this account so we conclude that the $ 9,451.50 represents taxable gross receipts. Petitioners do not contest that the $ 80,570.50 deposited in the Law Book Store account represents income or the amount of the deposits. See table supra p. 20. They do not contest the $ 2,000.00 amount deposited in the Group Legal Plan; however, they argue that Group Legal Plan was a separate entity and the income should not be attributed to them. We find GLP and FHIS deposits are properly included in petitioner's income. See supra p. 24-26. Petitioners have established TIC as the source for all but one of the cashier's checks included in respondent's schedule for 1978. (See infra p. 80) Petitioners have failed to prove the source of funds or the purpose for the cashier's check in the amount of $ 1,000.00 paid to the Arizona Bank. Accordingly, we view the $ 1,000.00 as properly included in taxable gross receipts. Based upon the foregoing, we conclude that petitioners received $ 1,187,544.21 in taxable gross receipts during 1978. [14]
*112 1979
After tracing petitioner's checks to respondent's schedules, we find the source of deposits to be as shown on the following page. The undocumented deposits are taxable receipts. The deposits from TIC (QCNB), Law Book Store, TIC Office Account, and FHIS bank accounts are nontaxable receipts. The transfer from Tall Timbers to TIC is to reimburse TIC for closing costs paid by TIC for the purchase of the mobile home park owned by the Tall Timbers syndication. Accordingly, the transfer does not represent taxable cash receipts. 1979
BANK ACCOUNTS Group
Orlando
TIC Office Deposit Source
TIC (QCNB)
Legal Plan Advertising
Account
Undocumented
$ 1,075,828.33 - -
$ 11,665.14
$ 6,816.68
TIC (QCNB) - -
$ 13,414.44
20,400.00
11,000.00
Law Book Store - - - -
250.00
4,000.00
TIC Office Account
15,000.00 - -
4,000.00 - -
FHIS - -
4,600.00 - -
3,000.00
Tall Timbers
5,785.41 - - - - - -
Freedom Fuel Corp
17,052.05 - -
10,800.00 - -
Leverage Leasing - - - - - - - -
Hamilton Rd.
2,588.62 - - - - - -
La Oficina
15,000.00 - - - - - -
Lake Estates
8,000.00 - - - - - -
Precious Metals
51,769.41
4,300.00 - -
10,000.00
Central Ohio Trust #1
10,000.00
- - 900.00 - -
Lake Middlebourne
137,328.95 - - - -
1,200.00
Casa Serena I and II
161,950.00
- -
5,000.00
30,000.00
Total
$ 1,500,302.77
$ 22,314.44
$ 53,015.14
$ 66,016.68
*113 MLJ
Deposit Source
Trust
Total Undocumented
$ 9,409.31
$ 1,103,719.46
TIC (QCNB)
2,000.00
46,814.44
Law Book Store
- - 4,250.00
TIC Office Account
480.00
19,480.00
FHIS
1,440.00
9,040.00
Tall Timbers
- - 5,785.41
Freedom Fuel Corp
- - 27,852.05
Leverage Leasing
18,200.00
18,200.00
Hamilton Rd.
- - 2,588.62
La Oficina
- - 15,000.00
Lake Estates
- - 8,000.00
Precious Metals
- - 66,069.41
Central Ohio Trust #1
- - 10,900.00
Lake Middlebourne
- - 138,528.95
Casa Serena I and II
59,300.00
256,250.00
Total
$ 90,829.31
$ 1,732,478.34
Mr. Fry's accountant Ronald Snook stated in a sworn affidavit that Freedom Fuel Corporation expenditures were paid to or on behalf of Mr. Fry. When Snook questioned the expenditures, Mr. Fry instructed Snook to "treat them as management or consulting fees rather than as wages for withholding purposes or as dividends." FFC expensed $ 405,073 in management and consulting fees on its tax return for fiscal year ending September 30, 1980. Accordingly, we view the transfers from Freedom Fuel as taxable gross receipts. Mr. Fry formed Leverage Leasing Corporation to operate as a money market fund for TIC's clients. *114 According to Fry, a ledger card would be prepared for each client investing money. A promissory note would be prepared for the deposit received. LLC in turn would transfer the money to one or more syndicated or nonsyndicated activities agreeing to pay interest for the money provided. Accordingly, the transfers from LLC are loans and nontaxable receipts. At the beginning of 1979, the Hamilton Road Partnership's balance sheet shows a $ 31,672.86 capital balance for Mr. Fry before subtraction of previously distributed losses of $ 68,157.90. The partnership liabilities as of January 1, 1979, include a mortgage of $ 550,000. We find no indication in the record of whether the partnership mortgage is a recourse or nonrecourse loan. Those partnership records for 1979 reflect a $ 99,501 capital contribution made during the year by Mr. Fry consisting of Tax Information Center expenditures in the amount of $ 95,551.00 and a $ 3,950 cash contribution. We have traced $ 21,183.24 of the TIC expenditures to the TIC Office Account. These expenditures were not expensed by TIC. It is apparent that some TIC expenditures were to be repaid and others were not. The transfer from Hamilton Road *115 Partnership identified above was recorded on the partnership's books as a repair and maintenance expense paid by cash. The $ 2,588.62 transfer identified was substantiated by documents indicating repayment was to be made. Accordingly, we conclude the $ 2,588.62 transfer to TIC is a loan repayment and does not consist of taxable gross receipts. La Oficina reported $ 37,500 as management or consulting fees expense in 1979. Assuming petitioners maintained a double entry set of books, it is logical to assume the credit side of this accounting entry would be either to credit the cash account or an account payable to Mr. Fry. The accounting records do not record an account payable to Mr. Fry, TIC, or the MLJ Trust. We therefore consider the $ 15,000 transfer identified to be taxable gross receipts as part payment of the management fee expense. Lake Estates' financial records dated September 30, 1979, report a management and consulting expense in the amount of $ 100,000.00. There is no account payable to, or account receivable from, TIC, Mr. Fry, or the MLJ Trust discernable from these records. The management and consulting expense at the end of 1979 was recorded as $ 110,867.36. *116 We conclude that the $ 8,000 is not repayment of a loan from TIC or a related entity because petitioners have failed to present a check proving the original loan transfer. Absent documentary evidence in the record of a loan from Lake Estates to TIC, we conclude that the $ 8,000.00 transfer was in part payment of the management or consulting expense. Precious Metals transferred $ 51,769.41 to TIC, $ 4,300.00 to Group Legal Plan, and $ 10,000.00 to TIC Office Account. The profit and loss statement groups all Precious Metals' expenses other than interest, depreciation, rent, and repairs as miscellaneous operating expenses. The attached records indicate that the operating expenses were paid by an open account. In addition, TIC transferred $ 16,229.62 to Precious Metals to open a bank account which is shown as an account payable to TIC. We conclude that the $ 66,069.41 transferred from Precious Metals is an advance for payment of Precious Metals' operating expenses and is not taxable receipts to petitioners. The Central Ohio Trust Trial Balance as of December 31, 1979, does not reflect an account receivable from TIC or Orlando Advertising at December 31, 1979. Thus, we conclude *117 that if the $ 10,900 transferred during 1979 to TIC and Orlando Advertising were loans, they were not outstanding at the end of 1979. Petitioners have not submitted checks or other documentary evidence proving a transfer from TIC and Orlando Advertising to Central Ohio Trust either as an original loan or a loan repayment. The loss reported on the Central Ohio Trust financial statements ($ 61,592.19) is not as great as that reported on the fiduciary tax return ($ 174,087) which compels the conclusion that all of the expenses were not recorded on the financial statements. These financial statements are unreliable and do not conclusively prove anything. Accordingly, we conclude that the $ 10,900 transferred during 1979 constitutes taxable gross receipts. The $ 138,528.95 transferred from Lake Middlebourne consists of $ 137,328.95 to TIC and $ 1,200.00 to TIC Office Account. During 1979, a restaurant was being constructed for Lake Middlebourne. In a letter to Lake Middlebourne investors dated August 9, 1980, TIC's vice president Curt Kittle stated that the construction costs of the restaurant were paid in cash. The transfers to TIC most likely represent repayment of those construction *118 costs. Accordingly, we conclude that these transfers are in the nature of loan repayments and are not taxable receipts. The financial records submitted to corroborate the losses shown on the Casa Serena I and II Trust returns are incomplete. We are unable to determine from these financial records whether or not any of the transfers from Casa Serena during 1979 were recorded as asset purchases, loans, or expenses. In a letter to clients dated August 15, 1979, Mr. Fry stated that in July 1979, he used $ 110,500 of Casa Serena I funds to purchase 61 acres of land for a new mobile home park to be operated by Casa Serena II in a joint venture with Casa Serena I, Mr. Fry, and his father. However, we are unable to find a single deposit of $ 110,500 in respondent's schedules. Further, we do not find a cashier's check purchased in July. That letter also states that Casa Serena I was a tax shelter in 1979 due to construction of the Casa Serena Mobile Home Park and invites clients to invest in Casa Serena Trust II. A "Fact Sheet" regarding Casa Serena II accompanied Mr. Fry's letter, and states that $ 100,000 is to be paid to Mr. Fry and his father as a design, planning, and organization *119 fee. While it is reasonable to infer that some of the transfers from the Casa Serena trusts repaid construction costs of the mobile home park, there is no evidence in this record for us to determine the amount. The transfer of $ 59,300 in to the MLJ Trust particularly concerns this Court because the MLJ Trust is Mr. Fry's personal trust. Mr. Fry has not established that he has a legal obligation to repay the $ 59,300 transfer and has absolute dominion and control over these funds. Further, if in fact the $ 59,300 constituted a loan, we see nothing to prevent Mr. Fry from later reclassifying the account receivable as payment of the design management and consulting fee because Mr. Fry has complete accounting control over the Casa Serena Trusts. A cash basis taxpayer must include income the earlier of actual or constructive receipt. Sec. 1.451-1(a), Income Tax Regs. We therefore conclude that $ 59,300 of the Casa Serena transfers is taxable gross receipts and $ 196,950 is in the nature of loan repayments. Petitioners are deemed, under Rule 142(a), to concede the following bank deposits are taxable gross receipts (See table, supra p. 20.): BANK ACCOUNT
Family Health & Improvement Society
$ 27,222.50
Law Book Store
10,405.20
TIC (BONB)
40,126.02
TIC (VNB)
939.30
Total
$ 78,693.02
*120 Cashier's checks
Petitioners have not documented the source of funds to purchase or the purpose for the $ 5,000.00 cashier's check purchased April 20, 1979, or the $ 129,515.00 cashier's check purchased December 10, 1979. See infra p. 88. We find no purpose or explanation of either of these checks in the record before us. However, we are satisfied that Mr. Fry was acting as a conduit purchasing syndication assets with the other cashier's checks listed. The check purchased on December 10th was co-endorsed by attorneys and from the record as a whole we infer that Mr. Fry purchased property with this check. However, we are unable to identify the property or the source of the funds. The check lists Mr. Fry as payee and, in absence of contrary evidence, we conclude that this check represents taxable receipts. Accordingly, petitioners had $ 134,515.00 of additional taxable receipts in 1979 from cashier's checks. Based upon the foregoing, we conclude that petitioners had total taxable gross receipts in 1979 as summarized on the following table. Deposit Source
Total Taxable Receipts
Nontaxable receipts
Undocumented
$ 1,103,719.46
$ 1,103,719.46
- -   TIC (QCNB)
46,814.44
- -   $ 46,814.44
Law Book Store
4,250.00
- -   4,250.00
TIC Office Account
19,480.00
- -   19,480.00
FHIS
9,040.00
- -   9,040.00
Tall Timbers
5,785.41
- -   5,785.41
Freedom Fuel Corp
27,852.05
27,852.05
- -   Leverage Leasing
18,200.00
- -   18,200.00
Hamilton Rd.
2,588.62
- -   2,588.62
La Oficina
15,000.00
15,000.00
- -   Lake Estates
8,000.00
8,000.00
- -   Precious Metals
66,069.41
- -   66,069.41
Central Ohio Trust #1
10,900.00
10,900.00
- -   Lake Middlebourne
138,528.95
- -   138,528.95
Casa Serena I
70,000.00
Casa Serena II
186,250.00
59,300.00
196,950.00
Subtotal
$ 1,732,478.34
$ 1,224,771.51
$ 507,706.83
Cashier's checks
496,691.11
134,515.00
362,176.11
Other deposits
78,693.62
78,693.62
- -   Total
$ 2,307,863.07
$ 1,437,980.13
$ 869,882.94
*121 1980
After tracing petitioners checks to respondent's deposit schedules, we find the source of deposits to petitioners' accounts during 1980 to be as shown on the following page. The undocumented deposits are income. The deposits listed above with TIC(QCNB), MLJ Trust, and MLJ/ML as their source are considered nontaxable transfers to prevent double inclusion of income. Petitioners argue that the $ 260,000 transferred from petitioners' Valley National Bank account to the MLJ/Merrill Lynch account should be removed from taxable receipts to avoid double counting because the money was transferred from one entity to a related entity, and, alternatively, because the Valley Deposit
Group
Orlando
TIC Office
Source:
Legal Plan
Advertising
Account
Undocumented
$ 2,421.37
$ 19,030.07
- -   TIC (QCNB)
27,133.04
12,755.00
12,165.14
MLJ Trust
- -   - -   - -   MLJ/ML
1,455.22
7,600.00
- -   Phillip Fry (VNB)
- -   - -   - -   Capital Appreciation Trust
- -   - -   - -   Freedom Fuel Corp
- -   21,100.00
2,000.00
Leverage Leasing
700.00
20,250.00
32,723.55
Sports Paradise R V Park
- -   - -   - -   Hamilton Rd. Pshp.
- -   - -   - -   Central Ohio Trust #1
- -   - -   - -   Jordan Estates
- -   - -   - -   Orchard Lakes
- -   - -   - -   Lake Middlebourne
- -   - -   - -   La Oficina
- -   - -   - -   Tall Timbers
- -   10,000.00
- -   Tradewinds Trust
- -   - -   - -   Fantasyland Trust
- -   - -   - -   Casa Serena
- -   - -   - -   Energy Lodging Trust
- -   - -   - -   Interest Earned
- -   - -   - -   Other Deposits
- -   - -   - -   Error Adjustments
- -   - -   - -   Total
$ 31,709.63
$ 90,735.07
$ 46,888.69
*122 1980
BANK ACCOUNTS
Deposit
MLJ MLJ/ Merrill
TIC Source:
Trust Lynch
(QCNB)
Undocumented
$ 61,474.68
$ - -   $ 675,864.56
TIC (QCNB)
4,360.00
- -   - -   MLJ Trust
- -   105,000.00
- -   MLJ/ML
74,800.00
- -   180,150.93
Phillip Fry (VNB)
- -   260,000.00
- -   Capital Appreciation Trust
82,500.00
- -   - -   Freedom Fuel Corp
44,700.00
140,000.00
33,975.00
Leverage Leasing
125,564.99
30,000.00
50,700.00
Sports Paradise R V Park
- -   25,000.00
16,000.00
Hamilton Rd. Pshp.
22,000.00
- -   9,750.00
Central Ohio Trust #1
1,760.76
- -   - -   Jordan Estates
38,570.00
- -   - -   Orchard Lakes
55,832.00
- -   - -   Lake Middlebourne
951.95
- -   4,000.00
La Oficina
2,500.00
- -   - -   Tall Timbers
1,558.00
- -   2,181.20
Tradewinds Trust
660.00
- -   42,750.00
Fantasyland Trust
159,700.00
- -   - -   Casa Serena
15,000.00
- -   - -   Energy Lodging Trust
50,000.00
- -   - -   Interest Earned
- -   10,284.00
- -   Other Deposits
290,039.77
529,305.97
- -   Error Adjustments
30,000.00
20,724.00
- -   Total
$ 1,061,972.15
$ 1,120,313.97
$ 1,015,371.69
Deposit
TIC
Guernsey
Source:
(BONB)
Lumber Co.
Total
Undocumented
$ 52,018.90
$ 23,572.44
$ 834,382.02
TIC (QCNB)
6,000.00
59,010.54
121,423.72
MLJ Trust
- -   10,000.00
115,000.00
MLJ/ML
- -   4,750.00
268,756.15
Phillip Fry (VNB)
- -   - -   260,000.00
Capital Appreciation Trust
- -   - -   82,500.00
Freedom Fuel Corp
- -   - -   241,775.00
Leverage Leasing
- -   - -   259,938.54
Sports Paradise R V Park
- -   - -   41,000.00
Hamilton Rd. Pshp.
- -   2,112.36
33,862.36
Central Ohio Trust #1
- -   1,508.02
3,268.78
Jordan Estates
- -   - -   38,570.00
Orchard Lakes
- -   - -   55,832.00
Lake Middlebourne
- -   - -   4,951.95
La Oficina
- -   - -   2,500.00
Tall Timbers
- -   - -   13,739.20
Tradewinds Trust
- -   - -   43,410.00
Fantasyland Trust
- -   - -   159,700.00
Casa Serena
- -   - -   15,000.00
Energy Lodging Trust
- -   - -   50,000.00
Interest Earned
- -   - -   10,284.00
Other Deposits
- -   - -   819,345.74
Error Adjustments
- -   - -   50,724.00
Total
$ 58,018.90
$ 100,953.36
$ 3,525,963.46
*123 National Bank account was not part of respondent's notice of deficiency. Petitioners submitted checks from the Valley National Bank to prove the source of funds transferred into the Merrill Lynch account. However, they did not prove the source of those same funds taxable or otherwise deposited in their Valley National account. Respondent did not allow the checks representing the $ 260,000 as a transfer on the MLJ/Merrill Lynch account, so we find the deposit amount was included as income in the notice of deficiency. We find that the $ 260,000 is properly included in petitioners taxable receipts because petitioners did not prove a nontaxable source for the initial deposit into the Valley National account. Our allowance of the MLJ Trust transfer to the MLJ/Merrill Lynch account as a nontaxable transfer prevents double inclusion of this income. The $ 82,500 received from Capital Appreciation Trust was in payment of a management, consulting, and organization fee for organizing that syndication. We find that this was properly included in petitioners' income. As noted in our discussion of 1979, the Freedom Fuel Corporation tax return for fiscal year ending September 30, 1989, expensed *124 $ 405,073 as a management and consultant fee. We find the deposits from Freedom Fuel Corporation are taxable receipts. Also as noted in our discussion of 1979, we consider the transfers from Leverage Leasing to be loans. Sports Paradise Recreational Vehicle Park (SPRVP) differed from the majority of the other syndications in the respect that Mr. Fry did not reserve a management fee for organizing, operating, and managing the trust. Instead, the SPRVP syndication documents contain a lease for the syndication to lease the land upon which the recreational vehicle park was to be built from Mr. Fry at a rate of $ 2,500 per year. The fiduciary tax return expensed $ 25,000 in distributorship fees and $ 2,500 as rent. We find that the $ 25,000 deposited in the MLJ Trust account was in payment of a prepaid ground lease and income to Mr. Fry. Sec. 61; sec. 1.61-8, Income Tax Regs.
There is no documentary explanation in the record of why $ 16,000 was transferred from SPRVP to TIC. The yearend financial statements show a $ 44,267.02 balance in the cash account while a notation states the actual check book balance was $ 971.02. In short, the financial statements are unreliable. The *125 recreational vehicle park was not constructed at the time this trust was syndicated and the trust had no other assets. In this instance we are able to trace the $ 16,000 transfer to syndication funds which, at the end of 1980, Mr. Fry has a duty to repay. Accordingly, we view the $ 16,000 transfer as nontaxable receipts. The transfer from the Hamilton Road Partnership to the MLJ Trust was in the form of a $ 22,000 check made payable to the MLJ Trust. The Hamilton Road Partnership charged this payment against Mr. Fry's capital account in the partnership to the extent of $ 16,092.92, and the remaining $ 5,907.08 was charged against the balance of the account payable owed to TIC. Thus, the $ 5,907.08 is not income. Our discussion of Hamilton Road Partnership for 1979 states how Mr. Fry had a loss in excess of his capital account and how that capital account was restored. The original deposits were included in TIC's income, so when Hamilton Roads recorded the expenses TIC paid as a capital contribution, Mr. Fry may be viewed as having made an economic contribution to the partnership. Accordingly, when the Hamilton Road Partnership made the above distribution, it was a return of *126 capital to Mr. Fry and not income. The $ 9,750.00 transfer was a loan repayment and is a nontaxable receipt. The Hamilton Road Partnership records reflect that the partnership expensed the amounts transferred to Guernsey Lumber Company as repairs and maintenance expense. According to Mr. Fry's accountant, the transfers from Hamilton Road Partnership and Central Ohio Trust to Guernsey Lumber Company would be sales receipts to Guernsey Lumber Company. We have no reason to doubt Mr. Snook's veracity and therefore conclude that the $ 2,112.36 transfer from Hamilton Road and the $ 1,508.02 transfer from Central Ohio Trust to Guernsey Lumber Company are taxable gross receipts. The balance sheet of Central Ohio Trust at December 31, 1979, does not reflect an account payable to the MLJ Trust. Petitioners have not introduced any documentary evidence of a transfer from the MLJ Trust either as an original loan or a loan repayment. We therefore conclude that the $ 1,760.76 transfer was not a loan and represents taxable gross receipts. The "Fact Sheets" and offer memoranda for the Jordan Estates and Orchard Lakes Estates syndications provide for a management, consulting, and organization *127 fee payable to Mr. Fry in the amounts of $ 50,000 and $ 80,000 respectively. The Orchard Lakes Balance Sheet at December 31, 1980, has an account payable for consulting fees in the amount of $ 27,710.00, which means the consulting fees were not paid all at once. The Jordan Estates financial records for 1980 reflect a $ 55,000 consulting fees expense but do not reflect an account payable for those consulting fees. We therefore conclude that the consulting fees were paid. Because the MLJ Trust was Mr. Fry's personal trust, and the transfers from these syndications were deposited to that trust, we find that the $ 38,570 and $ 55,832 were part payment of the management and consulting fee and therefore properly characterized as taxable receipts. Of the $ 4,951.95 transferred from Lake Middlebourne, $ 951.95 was drawn on the Lake Middlebourne payroll account. The inescapable conclusion is that $ 951.95 represents taxable wages. The check for the $ 4,000 transfer was written on another account, presumably the business account, made payable to TIC, and charged against the account payable to TIC. Petitioner has proven to our satisfaction that the $ 4,000 transfer to TIC was more likely *128 than not a loan repayment. The partial financial statements for La Oficina include a balance sheet for 1979 that does not reflect an account payable to the MLJ Trust at the end of 1979. Petitioners have not substantiated a transfer to La Oficina from MLJ during 1980, so we conclude that the $ 2,500 transfer was not a loan repayment. These La Oficina financial statements also include a 1980 profit and loss statement showing a loss ($ 15,192.91) different from that reported ($ 39,175) on the tax return filed by Mr. Fry. A balance sheet at the end of 1980 is not included. From petitioners' failure to include the balance sheet, we infer that it would not reflect a loan to MLJ Trust. Accordingly, we conclude that the $ 2,500 transferred is not a loan and constitutes taxable gross receipts. The financial records of the Tall Timbers Trust show the $ 1,558.00 and the $ 2,181.20 transfers were charged to the "Distributed Earnings" account. Because these transfers were charged on the books to the distributed earnings account and not a receivable or payable account, we conclude that these transfers were not loans or loan repayments. Mr. Fry made no initial capital contribution to this *129 syndication so these transfers are not a return of capital. We therefore conclude that they are taxable receipts. The $ 10,000 transfer from Tall Timbers to Orlando Advertising was drawn on a different bank checking account which is not reflected on the financial statements. Throughout 1980, the records of general ledger activity do not record this transfer as a loan or a loan repayment. Accordingly, we conclude the $ 10,000 transfer represents taxable receipts. The records of general ledger account activity reflect the $ 660.00 transferred from Tradewinds Trust as distributed earnings, not as loans or loan repayments. Mr. Fry made no economic contribution to Tradewinds Trust. We conclude that the $ 660.00 transferred is properly included in taxable gross receipts. The $ 42,500 transferred repaid TIC for the cashier's check purchased December 28, 1979. By the end of 1980, Mr. Fry was actively developing an amusement park called Paradise Lake Amusement Park. A TIC letter dated September 19, 1980, announced that the amusement park would be open to investors through a new trust named Fantasyland. The Fantasyland Trust Agreement states that the trust was formed to purchase *130 38 percent of Fantasyland, which covers 50 acres of Mr. Fry's 2,000-acre amusement park. The financial statements indicate that $ 733,625 of the $ 1,520.000 capital solicited purchased 18.34 percent of the amusement park assets. The general ledger activity records an initial account payable to the MLJ Trust amounting to $ 733,600 (18.34 percent of 4 million dollars). The trust paid $ 640,196.75 leaving a balance of $ 93,403.25 remaining in the account payable to the MLJ Trust. We conclude that the deposits to the MLJ Trust were for the purchase of the amusement park assets and are properly included in taxable gross receipts. We are not able to precisely determine the purpose of the transfers from Casa Serena to the MLJ Trust during 1980 on the record before us. Mr. Fry deposited the $ 15,000 in his trust and it is more likely than not that the check was issued in payment of the design, management, and consulting fee. Nevertheless, petitioners have argued the $ 15,000 transferred constitutes loans and they bear the ultimate burden of persuading this Court. They have failed to do so, and we conclude that the amount is properly included in taxable gross receipts. The records *131 submitted to corroborate the Energy Lodging Trust tax return consist of a profit and loss statement, a schedule distributing the loss to the "trust beneficiaries", and page 3 of the general ledger activity schedule. We are unable to find any documentation of a loan from Energy Lodging to the MLJ Trust from these documents. Petitioners have failed to introduce any documentary evidence of an original loan transfer, so we conclude the $ 50,000 Energy Lodging transfer was not repayment of a loan to the MLJ Trust. Mr. Fry deposited the $ 50,000 transferred in his personal trust, and has not established a legal obligation to repay those funds. Petitioners have simply not persuaded us that the $ 50,000 transferred should be treated as nontaxable receipts. The deposits listed as "Other Deposits" under the MLJ Trust column consists of a single deposit made on May 23, 1980. Petitioners produced the deposit slip for that deposit at the trial of this case. The deposit consists of three amounts, $ 142,651.00, $ 141,674.48, and $ 5,714.29. The exact same dollar amount was transferred from the MLJ Trust account to the MLJ/Merrill Lynch account on May 22, 1980 -- a day before the amount was *132 even deposited in the MLJ Trust account. Mr. Fry testified that the source of these funds was from investors in the Innovative Investors Trust Syndication. The cost of a share of beneficial interest in this trust was $ 5,714.29. The first two amounts shown on the deposit slip are not equally divisible by 5,714.29. The partial financial reports state $ 291,429.00 was invested in this trust during 1980. A representative trust agreement introduced into evidence dated August 5, 1980, for the purchase of one unit of beneficial interest for $ 5,714.29 when added to the May 23, 1980, deposit clearly exceeds the $ 291,429.00 capitalization. In short, we do not believe Mr. Fry's testimony that the total amount of the deposit consists of investors' funds. It is inconceivable to this Court how Mr. Fry could know exactly how many investors would wire a specific amount of money on a particular date to purchase an interest in a syndication the day before the actual transfers. The third item in the amount of $ 5,714.29 shown on the deposit slip is conceivably an investor's contribution and the portion of the deposit constituting income is to be reduced accordingly. The MLJ/Merrill Lynch *133 account "Other Deposits" amount shown above contains two deposits. Mr. Fry assertedly received the deposit amounts of $ 126,361.66 and $ 402,944.31, as a straw man in an alleged tax-free section 1031 exchange from the sale of the Worthington Arms Mobile Home Park. Mr. Fry owned 10 percent and his father owned 90 percent of this mobile home park. Loan closing documents and a receipt from Merrill Lynch submitted by petitioners support the source of the funds for the two deposits. As a straw man in the alleged tax free exchange, 10 percent of the receipts attributable to Mr. Fry's ownership are taxable receipts. We need not decide whether the alleged tax free exchange is meritorious. [15] We are satisfied that 90 percent of the proceeds from the mobile home park sale should be attributed to Mr. Fry's father. Accordingly, $ 52,930.60 represents taxable receipts to petitioner. *134 Petitioners are deemed, under Rule 142(a), to have conceded the following bank deposits are taxable gross receipts (See table, supra p. 20.): BANK ACCOUNTS
Family Health & Improvement Society
$  17,678.06
TIC (VNB)
18,980.00
Increasing Innovative Income Magazine
22,547.53
Amusement Concepts
42,500.00
Total
$ 101,705.59
Cashier's Checks It appears from the endorsements on several of the cashier's checks that Mr. Fry purchased amusement rides costing $ 87,587.85. See infra p. 99. According to Mrs. Fry's schedules, $ 29,000 came from Freedom Fuel Corporation, but the transfer is not corroborated by a cancelled check. We find no further evidence of the source of the transfer or that the transfer represents a bona fide loan. It would be consistent with Mr. Fry's prior practice to expense amounts paid on his behalf by FFC as a management fee. In the absence of any credible evidence to the contrary, we conclude that the $ 29,000 is properly included in taxable gross receipts. Of the other $ 58,587.85, Mrs. Fry's schedules reflect that $ 27,000 came from Fantasyland, $ 15,000 came from Amusement Concepts, and the remainder ($ 16,587.85) came from "related syndications" *135 and is not substantiated by documentary evidence. Petitioners have not substantiated the source of funds used to purchase other cashier's checks totalling $ 34,463.87, one of which is a $ 5,000 check made payable to Mrs. Fry. As discussed above, Mr. Fry sold 18.34 percent of a portion of his amusement park to the Fantasyland syndication. We view the $ 27,000 transferred from Fantasyland as part of the purchase price paid to Mr. Fry and should be included in taxable gross receipts. Petitioners deposited $ 42,500 in the Amusement Concepts bank account which is included in respondent's bank deposits analysis. The $ 15,000 from Amusement Concepts used to purchase the cashier check must be removed to prevent double inclusion of income. Based upon the foregoing, we conclude that petitioners received additional taxable receipts of $ 107,051.72 in 1980 which they used to purchase cashier's checks. Deposit Source:
Total Deposits
Taxable Receipts
Nontaxable receipts
Undocumented
$ 834,382.02
$ 834,382.02  - -
TIC (QCNB)
121,423.72
- -
$ 121,423.72  MLJ Trust
115,000.00
- -
115,000.00
MLJ/ML
268,756.15
- -
268,756.15
Phillip Fry (VNB)
260,000.00
260,000.00
- -
Capital Appreciation
82,500.00
82,500.00
- -
Trust
Freedom Fuel Corp
241,775.00
241,775.00
- -
Leverage Leasing
259,938.54
- -
259,938.54
Sports Paradise RV
41,000.00
25,000.00
16,000.00
Park
Hamilton Rd. Pshp.
33,862.36
2,112.36
31,750.00
Central Ohio Trust #1
3,268.78
3,268.78
- -
Jordan Estates
38,570.00
38,570.00
- -
Orchard Lakes Estates
55,832.00
55,832.00
- -
Lake Middlebourne
4,951.95
951.95
4,000.00
La Oficina
2,500.00
2,500.00
- -
Tall Timbers
13,739.20
13,739.20
- -
Tradewinds Trust
43,410.00
660.00
42,750.00
Fantasyland Trust
159,700.00
159,700.00
- -
Casa Serena
15,000.00
15,000.00
- -
Energy Lodging
50,000.00
50,000.00
- -
Interest Earned
10,284.00
10,284.00
- -
Other deposits
819,345.74
337,256.08
482,089.66
Deposit schedule
total *
$ 3,475,239.46
$ 2,133,531.39    $ 1,341,708.07    Other bank accounts
101,705.59
101,705.59
- -
Cashier's checks
131,325.16
107,051.72
24,273.44
Total receipts
$ 3,708,270.21
$ 2,342,288.70    $ 1,365,981.51    *136 We find that petitioners had taxable gross receipts in 1980 in the amount of $ 2,342,288.70 as shown on the preceding table. In summary, we have determined the amount of gross receipts separately for all years at issue to be as follows: Year
Gross Receipts
1977
$ 226,615.99
1978
$ 1,187,544.21
1979
$ 1,437,980.13
1980
$ 2,342,288.70
EXPENSES
Shortly before the trial of this case, petitioners provided copies of the 1978 and 1979 workpapers to respondent's agents in support of their claim of deductible expenses. The income portions of the workpapers were blackened obscuring the income figures. Petitioners also produced, for the first time, detailed ledger cards, schedules, and cancelled checks in support of their claimed expenses. Mrs. Fry prepared and provided schedules for each expense *137 category in each year supported by cancelled checks and ledger cards. While petitioners provided documentation pertaining to the expenses of their own activities, they provided no underlying documentation for the syndicated entities which would support deductions for syndication expenses for the years 1978, 1979, or 1980. Revenue Agent Anderson allowed the majority of the claimed deductions. Certain expenditures were capitalized and depreciated. Other expenditures were disallowed for lack of substantiation, duplication, or because they were non-deductible personal expenses. All of petitioners' personal family and living expenses were paid from the business checking accounts. After concessions, the expenses, other than depreciation and syndicated trust losses, that are disputed by the parties are as follows. Expense Category:
1977
1978 1979
1980 Automobile
$ 402
$ 4,864
$ 5,264
$ 242
Indep. Contractors
- -
- -
$ 75,244
- -
Reimbursed Expenses
- -
- -
- -
$ 1,500
Travel
- -
- -
$ 10,390
$ 7,776
Legal Fees
- -
- -
$ 8,340
- -
Bad Debts
- -
$ 154,706
$ 179,804
$ 185,546
Petitioners assert they are entitled to a 60-percent business usage *138 of their automobiles instead of the 50 percent allowed by respondent. They have failed to present any credible evidence to support the increased usage. Accordingly, we sustain respondent's allowance of automobile expenses for 1977, 1978, and 1979. Petitioners produced receipts for gasoline purchases dated in 1980 totaling $ 800.83. In keeping with respondent's allowance of 50 percent, petitioners are entitled to automobile expenses totaling $ 400.42 for 1980. Respondent disallowed independent contractor expense in the amount of $ 56,651.00 for lack of substantiation and $ 18,593 for duplication of expense already allowed. Petitioners have failed to substantiate additional independent contractor expenses. Therefore, we sustain respondent's determination. Respondent disallowed 1979 travel expenses as personal ($ 483), for duplication ($ 9,859), and for lack of substantiation ($ 48). He disallowed 1980 travel expenses of $ 7,776 as personal expenses. Petitioners have failed to present any credible evidence to disturb respondent's determination of such expenses. Respondent disallowed $ 6,340 in legal expense for lack of substantiation and a $ 2,000 transfer to GLP. Petitioners *139 have failed to present evidence to substantiate these claimed expenses. Petitioners claim they are accrual method taxpayers and entitled to a bad debt expenses they calculated by deducting 16 percent of TIC's gross sales for the year. The amounts claimed as bad debts were not actual payments under the TIC guarantee of results but were an accounting estimate based upon Mr. Fry's best estimate of how much TIC would ultimately repay clients. Rather than the direct charge-off method, petitioners claim to use the reserve method of accounting for bad debts. Expenses must be determined on the same method of accounting as is used for determining taxable income. Sec. 461(a). Respondent determined petitioners' income on the cash basis by use of the bank deposits method. Petitioners have failed to produce reliable books and records kept on the accrual basis from which we may determine their accrual basis income. Moreover, the expenses claimed by petitioners are technically more in the nature of an anticipated warranty expense reserve rather than a bad debt reserve. The section 166(c) bad debt reserve is therefore inapplicable by definition. The depreciation expense is in dispute due *140 to disagreement on the cost basis of equipment purchased during 1978 and 1979. [16] Respondent concedes adjustments to the depreciable basis for some equipment purchased. Petitioners failed to substantiate other equipment purchases. We therefore find the depreciation expenses on equipment to be as follows: [17]
Year
Depreciation
Depreciation Expense   Basis
1977
1978
1979
1980
Pre-1977
$ 36,053
$ 6,448
$ 5,094
$ 3,647
$ 3,034
1977
$ 26,461
7,561
5,400
3,858
2,789
1978
$ 163,675  - -
37,147
36,149
25,821
1979
$ 96,890
- -
- -
27,684
19,774
1980
$ 45,774
- -
- -
- -
13,078
Total
$ 14,009
$ 47,641
$ 71,338
$ 64,496
In addition to depreciation and the above scheduled expenses, petitioners claim entitlement to syndicated trust *141 losses. The MLJ Trust held beneficial interest in almost all of the syndicated entities formed and promoted by Mr. Fry. Some of the trust returns introduced into evidence were incomplete in that the beneficial interests reported on the Schedules K-1 did not equal the total beneficial interest in the trust. In other cases, the amount distributed exceeded the net loss reported on the return. Respondent did not allow the syndicated trust losses because the losses are not identifiable from petitioners' returns; petitioners have not substantiated the expenses and refused to allow respondent to examine the syndications' books and records; petitioners have not substantiated that they had sufficient tax basis to permit deduction of their distributive share of the losses; and the syndications losses are due, in part, to bogus Freedom Fuel Corporation license deductions. Petitioners' share of syndicated trust losses shown on the syndication trust returns are shown on the following page. 1979
Form 1041 loss
Fry Share
Precious Metals Holding Co.
$    83,888
$  42,974
Casa Serena Trust I & II
121,267
15,461
Central Ohio Trust #1
434,942
196,164
Hamilton Rd. Ptnrshp., A Trust
72,923
41,019
La Oficina Trust
119,996
19,196
Lake Estates, A Trust
450,981
180,385
Lake Middlebourne Estates, A Trust
98,053
10,187
Tall Timbers Trust
101,144
31,520
Tradewinds Trust
118,436
13,028
Total claimed in 1979
$ 1,601,630
$ 549,934
1980
Precious Metals Holding Co.
$    45,136
$  37,536
Casa Serena Trust I & II
349,167
11,724
Central Ohio Trust #1
174,087
77,643
Hamilton Rd. Ptnrshp., A Trust
34,012
19,132
La Oficina Trust
39,175
10,185
Lake Estates, A Trust
195,662
75,134
Lake Middlebourne Estates, A Trust
142,007
14,769
Tall Timbers Trust
108,897
33,927
Tradewinds Trust
85,220
9,347
Capital Appreciation Trust
276,867
46,514
Columbus Game Arcade, A Trust
24,940
16,616
Energy Lodging Trust
144,958
57,983
Fantasyland Trust I
338,823
0.00
Innovative Investor Trust
22,001
8,800
Jordan Estates, A Trust
112,812
22,562
Orchard Lakes Estates
142,992
22,879
Sports Paradise R. V. Park
27,500
0.00
Total Claimed in 1980
$ 2,264,256
$ 464,751
*142 The above syndication trust losses include deductions for Freedom Fuel Corporation distributorship license agreements. Petitioners concede the deductions for the license agreements but claim entitlement to remaining trust losses, exclusive of FFC deductions, in the amounts of $ 324,164 and $ 366,037 for 1979 and 1980, respectively. Petitioners submitted partial financial statements and fiduciary income tax returns (Forms 1041) to support their claimed syndication loss deductions. The financial statements consisted of a profit and loss statement and the portion of the balance sheet showing the liabilities and capital. Almost all of the balance sheets presented did not contain the assets section. Respondent is not bound to accept a taxpayer's return at face value. Holland v. United States,348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Petitioners never provided respondent's agents with any original source documentation in support of the claimed deductions for the syndicated trust activities. Instead, they rely on partial financial statements which are incomplete, unreliable, and insufficient to substantiate the *143 claimed trust losses. [18] Because petitioners have failed to substantiate the syndication trust losses they claim to this Court, we hold they are not entitled to any deductions from the syndicated activities. *144 In summary, we find and hold that petitioners are entitled to total expenses as shown below. The categories of expenses are detailed in appendix D and include all allowed expenses and adjustments in accordance with the foregoing discussion. Year
Total Expenses
1977
$   138,377
1978
$   666,834
1979
$ 1,125,920
1980
$ 1,530,960
FRAUD
Respondent has the burden to prove fraud under section 6653(b) by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that there is some underpayment of tax and that petitioner engaged in conduct intended to conceal, mislead, or otherwise prevent the collection of taxes known to be owing. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Wedvik v. Commissioner, 87 T.C. 1458, 1468-1469 (1986); Rowlee v. Commissioner, 80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard *145 v. Commissioner, 69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, 80 T.C. 1111 (1983). The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954). However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). *146 Fraud may not be found under circumstances which at the most create only suspicion. Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950). Badges of fraud which may be taken into account include: (1) The making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); (2) the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); (3) understatements of income; (4) inadequate records; (5) failure to file tax returns; (6) implausible or inconsistent explanations of behavior; (7) concealment of assets; and (8) failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Petitioners' returns show a consistent pattern of underreporting their income. For the 1974, 1975, and 1976 taxable years, petitioners reported a net operating loss. After respondent examined the income tax returns for those years, petitioners were found to have deficiencies in tax. Petitioners admitted these deficiencies *147 in a previously docketed case. We have found petitioners have also underreported their income for 1977, 1978, 1979, and 1980. Another consistent pattern that emerges when petitioners' returns are examined is that they filed "one-line returns" or returns which list minimal amounts of information. We view this as further evidence of petitioners' attempting to conceal the presence and source of their income. Petitioners claimed bogus Freedom Fuel Corporation deductions on their returns indirectly by claiming syndicated trust losses. They further claimed syndicated trust losses for which they had no economic loss. It is well settled that a fraudulent understatement of income can be accomplished by an overstatement of deductions. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). In determining the presence of fraud we may consider the native ability and the training and experience of the party involved. 73 Iley v. Commissioner, 19 T.C. 631, 635 (1952); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972). This includes a party's educational background. Drobny v. Commissioner, supra at 1349.
The evidence shows that Mr. Fry was well educated and was mature, sophisticated, and shrewd in business matters. He also authored and sold several books on tax planning strategies. We think he knew what he *148 was doing and what he attempted to accomplish during the years in issue, which was the evasion of tax on substantial income. A finding that a taxpayer acted fraudulently may also be supported by the fact that he was evasive, uncooperative, or dilatory during the course of the Commissioner's examination. Such conduct tends to indicate an effort to conceal the true facts concerning the taxpayer's financial affairs. Powell v. Granquist, 252 F.2d 56, 60-61 (9th Cir. 1958); Estate of Beck v. Commissioner, 56 T.C. 297, 365 (1971). Mr. Fry's uncooperative attitude concerning respondent's examination is well documented in our findings and need not be repeated here. Accordingly, we find and hold *149 that Mr. Fry was fraudulent for all years in issue and is therefore liable for the additions to tax under section 6653(b). Fraud is not imputed from one spouse to another. In the case of a joint return, respondent must prove fraud as to each spouse charged for the addition to tax. Sec. 6653(b); Hicks Co. v. Commissioner, supra at 1030; Stone v. Commissioner, supra at 227-228. Respondent has not proven overt acts of Mrs. Fry sufficient to justify imposing the section 6653(b) addition to tax against her and, accordingly, has not carried his burden in proving her fraudulent intent. STATUTE OF LIMITATION
In light of our holding that a part of petitioners' underpayment of tax for all years in issue was due to fraud with the intent to evade tax, it necessarily follows that the assessment of the deficiencies for those years is not barred by the statute of limitations. [19]Sec. 6501(c)(1). *150 SELF-EMPLOYMENT TAX
Respondent determined petitioners were liable for self-employment tax in the amounts of $ 1,303.00, $ 1,434.00, $ 1,855.00, and $ 2,098.00 for 1977 through 1980, respectively. This self-employment tax was based on Mr. Fry's self-employment income. On brief, petitioners admit to having income in 1977 and 1978, but argue any income in these years is offset by net operating losses incurred in 1979 and 1980. In essence, petitioners argue they had no self-employment income for the years in issue. Section 1401 imposes a tax, in addition to other taxes, on the "self-employment income" of every individual. Generally, self-employment income is the net income derived from carrying on a trade or business. Sec. 1402. Mr. Fry's net earnings from self-employment appear to exceed the Social Security wage and contribution base, and we therefore sustain respondent's determination subject to the parties' Rule 155 computation. Sec. 6654(a) ADDITIONS TO TAX
Section 6654(a) imposes an addition to tax for underpayment of estimated tax. During the years in issue section 6654(d) provided four exceptions to imposition of the section 6654(a) addition to tax. In general, *151 those exceptions applied if the amount of estimated tax paid exceeded (1) the tax shown on the individual's prior year's return, if such return showed a tax liability and the prior year was a 12-month period; (2) 80 percent of the current year's tax; (3) 90 percent of the tax computed, at current year's rates, on the basis of actual income and actual self-employment income for the months in the taxable year ending before the month in which the installment is to be paid, and if such months constituted the taxable year; and (4) tax computed at current year's rates on the prior year's income. Petitioners received taxable income during all years in issue but did not make any estimated tax payments. Therefore, none of the above exceptions apply and petitioners are liable for the section 6644(a) addition to tax. Petitioners argue that 1979 and 1980 net operating losses offset prior years' income so that there is no underpayment for any year at issue. Alternatively they argue that, if this Court finds they underpaid their estimated tax liability, then such underpayment triggered no addition under section 6654 because they incurred no tax liability for the previous year. Petitioners *152 cite section 6654(e)(2) as their authority. Petitioners did not have a net operating loss for their 1979 and 1980 taxable years. They stipulated to a decision admitting they owed $ 740.47 in income tax, not including any additions to tax, for their 1976 taxable year. Moreover, petitioners may not take advantage of the section 6664(e)(2) exception because that section was added to the Internal Revenue Code in 1984, effective for taxable years beginning after 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, secs. 411-412, 98 Stat. 494, 788-793. Petitioners' also argue that even if this Court determines that they underpaid their tax and no other exception applies, the underpayment was due to reasonable cause, i.e., "petitioners' reasonable belief they were spending more in business deductions than they were receiving in gross income," and that imposition of the addition would be against equity and good conscience. Sec. 6654(e)(3). Section 6654(e)(3) was enacted by section 411 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 788, 790 for taxable years beginning in 1984. Prior to 1984, the provisions of 6654(a) were mandatory and extenuating circumstances were *153 irrelevant. Estate of Ruben v. Commissioner, 33 T.C. 1071, 1072 (1960); Toner v. Commissioner, T.C. Memo 1990-539. Furthermore, the "equity and good conscience language refers to underpayments caused "by reason of casualty, disaster, or other unusual circumstances." Sec. 6654(e)(3)(A). Petitioners have not offered such proof. Accordingly, the section 654(e)(3) exception does not apply to excuse petitioners' underpayment of estimated tax. To reflect our findings and conclusions herein and the concessions made by the parties, Decision will be entered under Rule 155. APPENDIX A AGREEMENT AS TO SCOPE OF SERVICES AND FEE 1. SCOPE OF SERVICES. Tax information Center will provide a written analysis of the financial tax situations of     to determine: 1) that alternatives may exist to reduce federal income taxes, state and local income taxes, federal death taxes, and probate administration expenses; 2) how to replace high cost cash value life insurance with low cost term insurance; and 3) how to increase investment income yield and investment capital appreciation. The client shall receive a written report which will recommend such *154 alternatives and explain such alternatives. Once the client has chosen which alternatives he (she) wishes to implement, Tax Information Center will assist the client in obtaining a capable attorney to implement any steps which need the assistance of a capable attorney. Tax Information Center will reimburse the client for the fees charged by such attorney or, if the client so initials his approval here (    yes, please pay attorney fees direct), pay the attorney directly -- provided that Tax Information Center specifically agrees in this contract to pay the particular lawyer, law firm, or group legal plan selected by the client. Client prefers to use the following lawyer: []    [] Group Legal Plan of Family Health and Improvement Society. Client(s) applies for membership at no cost to client(s) in the Family Health and Improvement Society. Membership entitles client(s) to participate in the Group Legal Services Plan of Family & Health Improvement Society. Client's signature Client's signature Tax Information Center will do all federal, state and local income tax returns which reflect tax planning done by Tax Information Center for the year *155    , and will handle federal tax audit for such year if client is audited by I.R.S., at no cost to client. To make federal and state income tax and death tax laws more understandable to client(s), Tax Information Center will provide to client(s) at no additional fee, and client agrees to read or participate in: a) Philip Fry's books, Pay No Income Taxes Without Going To Jail, How to Disinherit The I.R.S. & Probate Court, Blood Taxes At Harvest Time, I.R.S. Code Made Understandable, and How to Find And Profit From Real Estate Bargains: b) client reference manuals on how to use the various tax-planning entities selected by client(s); c) Tax Information Center's monthly tax-serving magazine TAXING TIMES; d) attendance at one of Tax Information Center's two-day weekend seminars (20 hours long on Saturday and Sunday). The seminars are held monthly at one of the following Tax Information Center offices: Seattle, Washington,; California; Phoenix, Arizona; Columbus, Ohio; or Cambridge, Ohio. 2. TERM OF CONTRACT. The duration of this contract is one year beginning the date of this Agreement on Page Two. Tax planning, tax returns, and tax audits for the next two subsequent years *156 are available to client, at the option of the client, at an annual percent of the first year fee provided for in paragraph four of this Agreement. 3. GUARANTEE OF RESULTS. Tax Information Center guarantees to save the client at least ten times the fee specified in paragraph four of this agreement plus any additional fees paid for tax planning, tax returns, and tax audits done by Tax Information Center in the two years following Client(s)' Initials:    the initial year in federal, state, and local income taxes for the years    ,    , and    , and file insurance premiums reduced for the same three years, and in gains in client investment income and capital appreciation due to Tax Information Center Investment guidance, plus projected savings of federal and state death taxes and probate administration at the death of client and client's spouse. Within six months after the end of the third year mentioned in this paragraph above, Tax Information Center agrees to refund pro-ratably (up to 100 percent of its fee) fees paid to Tax Information Center if necessary to enable client to have a ten times benefit under this GUARANTEE OF RESULTS -- provided that the client *157 implements at least 90 percent of all suggestions recommended by Tax Information Center, and that Tax Information Center does all tax planning, tax returns, and handles the audit defense for the three years specified in this paragraph, and that client pays all fees to Tax Information Center in full without any collection effort by Tax Information Center. 4. FEE. The client agrees to pay Tax Information Center an analysis and implementation fee of     ($    ) which is the sum total of the tax planning options selected by client on the attached Schedule A, "Determination of Client Fee," which is hereby made an integral part of this Agreement. If client decides, after the date of this Agreement, to implement options not previously selected, client agrees to pay the fees for those additional options as specified in the attached Schedule A. Renewal fees for each of the first two years following the first year shall be as specified in the attached Schedule A. Any governmental fees such as filing costs, franchise fees paid by corporations, etc. will be paid by client directly. MAKE YOUR CHECK PAYABLE TO "PHILLIP S. FRY, PRESIDENT OF TAX INFORMATION CENTER." PLEASE DO NOT PAY *158 IN CASH OR CURRENCY. Mail all payments, including renewal fee, after the signing of this contract, only to Tax Information Center, Rt. 1, New Concord, Ohio 43762. If client fails to pay the fee in full, client(s) signing this Agreement herein agrees to pay all reasonable attorneys fees and court costs and collection agency fees incurred by Tax Information Center in collecting its fes, but such collection costs shall not exceed 50 percent of the amount due from client(s) signing this agreement. Client(s) understands and agrees that the fee charged by Tax Information Center is refundable only under the express provisions of paragraph three of this Agreement. 5. COVENANT NOT TO REVEAL TAX PLANNING IDEAS TO OTHERS. Tax Information Center has developed and perfected a number of tax-saving concepts and agreement wordings for client and client's selected attorney to use as examples for successful tax planning and estate planning. Client(s) signing this agreement specifically recognize that the ideas and agreement wordings communicated by Tax Information Center to client(s) attorney and client(s) are only for the use of the parties specified in paragraph one of this agreement. If *159 client(s) should ever show or share such idea or agreements with someone or entity other than client(s)' lawyer, accountant, tax collectors, or parties specified in paragraph one of this Agreement and their immediate families, client(s) agrees to pay Twenty-Five Thousand Dollars ($ 25,000.00) per person or entity communicated with as a fee to Tax Information Center and to pay all attorney fees and court costs incurred in collecting said fee from client(s). 6. REFERRAL FEE. IF client is satisfied with the analysis and implementation by Tax Information Center and knows taxpayers who could also benefit from such analysis and implementation by Tax Information Center, client should refrain from violating the covenant of paragraph five above (Covenant Not To Reveal Tax Planning Ideas To Others), but, rather inform in writing the National Sales Manager of Tax Information Center (Rt. 1, New Concord, Ohio 43762) of such referrals. Client referrals are entered in a register of referrals with a notation of the client who made the referrals. If such referral in fact becomes a client of Tax Information Center, Tax Information Center will pay a five percent (5%)-of-fee-collected referral fee *160 to the client making the referral. 7. COVERED SERVICES. Tax Information Center agrees to provide only those services specifically provided for in writing in this contract. 8. SOURCE OF STATE LAW. This Agreement is a full statement of the terms of Agreement between Tax Information Center and client(s). Should there be a question as to the meaning of this Agreement, such questions shall be resolved based on the contract laws of the State of Ohio. The client(s) agrees that any litigation of any kind between Tax Information Center and the client(s) shall take place in the Common Pleas Court of Guernsey County, Ohio. Client(s) agrees to by subject to the jurisdiction of the Common Pleas Court of Guernsey County, Ohio for any litigation between the parties. This agreement was entered into on this     day of    , 19  TAX INFORMATION CENTER by its President Philip S. Fry CLIENT CLIENT APPENDIX B 1977
Item
Check
Check
Payor/ No.
Number
Date
Drawer Payee
Amount
104-1
556 6/09/77
Law Book Store
TIC
* $ 520.00
104-2
623 6/21/77
Law Book Store
TIC
65.00
104-3
559 5/31/77
Law Book Store
MLJ
100.00
104-4
1086 5/22/77
TIC
MLJ
20.00
104-5
1048 2/17/77
TIC (VNB)
LBS
300.00
104-6
1050 2/17/77
TIC (VNB)
LBS
300.00
104-7
1176 9/02/77
TIC (VNB)
LBS
500.00
104-8
1821 7/14/77
Orlando Adv.
LBS
110.00
*161 1978 Item
Check
Check
Payor/ No.
Number
Date
Drawer Payee
Amount
105-1
#1 10/10/78
Phillip Fry
TIC
$ 9,500.00
105-2
#2 10/20/78
Phillip Fry
TIC
450.00
105-3
229 10/17/78
MLJ Trust
TIC
9,000.00
105-4
142 8/12/78
F.H.I.S.
* 1,300.00
105-5
1600 2/15/78
TIC
MLJ
300.00
105-6
00604 7/12/78
TIC
MLJ
700.00
105-7
00635 7/26/78
TIC
MLJ
300.00
105-8
00768 8/22/78
TIC
MLJ
300.00
105-9
00818 8/31/78
TIC
MLJ
200.00
105-10
00867 9/12/78
TIC
MLJ
300.00
105-11
127 3/14/78
F.H.I.S.
Orl.Adv.
450.00
105-12
00272 4/11/78
TIC
FHIS
* 2,900.00
105-13
DM 9/28/78
TIC
FHIS
* 350.00
105-14
00591 7/07/78
TIC
CASH
8,222.00
105-15
01838 12/14/78
TIC
QCNB
10,000.00
105-16
01041 10/27/78
TIC
QCNB
1,760.00
*162 1979
Item
Check
Check
Payor/ No.
Number
Date
Drawer Payee
Amount
106-1
126
4/08/79 Hamilton Rd. Pshp
TIC
$ 2,588.62
106-2
101
9/07/79 Casa Serena No. II
TIC
16,900.00
106-3
108
11/09/79 Casa Serena No.II
TIC
25,000.00
106-4
114
9/14/79 Central Ohio No. 1
TIC
x 10,000.00
106-5
355
4/20/79 Lake Middlebourne
TIC
1,297.50
106-6
DM
6/08/79 Lake Middlebourne
TIC
40,000.00
106-7
DM
3/26/79
Precious Metals
TIC
TOA
20,000.00
106-8
#3 2/13/79 Casa Serena
P. Fry
10,000.00
106-9
#5 2/20/79 Casa Serena
P. Fry
25,000.00
106-10
-- 12/10/79 Tall Timbers
TIC
5,785.41
106-11
356
4/26/79 Lake Middlebourne
TIC
5,000.00
106-12
103
10/10/79 Casa Serena No. II
TIC
10,000.00
106-13
122
1/09/79 TIC Office Account
TIC
* 9,000.00
106-14
158
1/16/79 TIC Office Account
TIC
* 6,000.00
106-15
#7 2/28/79 Casa Serena
TOA
25,000.00
106-16
DM
3/26/79
Precious Metals
TIC
10,000.00
106-17
CM
3/26/79
Precious Metals
TOA
10,000.00
106-18
192
6/27/79 Lake Middlebourne
TOA
1,000.00
106-19
01130
3/08/79 TIC
TIC
x 2,000.00
106-20
DM
6/18/79 TIC
TOA
x 1,000.00
106-21
DM
11/01/79 Casa Serena No. II
MLJ
59,000.00
106-22
#1001
9/26/79 TIC
MLJ
* 380.00
106-23
157
4/15/79 FHIS
S. Fry
500.00
106-24
01345
4/20/79 TIC
S. Fry
* 200.00
106-25
01382
5/03/79 TIC
S Fry
* 400.00
106-26
123
1/09/79 TIC Office Account
MLJ
* 100.00
106-27
DM
5/06/79 TIC
MLJ
* 400.00
106-28
CM
11/01/79 Casa Serena &
Leverage Leasing
MLJ
77,500.00
106-29
DM
11/01/79
Leverage Leasing
MLJ
18,200.00
106-30
#6 2/28/79 Casa Serena
Orl.Adv.
5,000.00
106-31
02905
9/27/79 TIC
Orl.Adv.
1,000.00
106-32
02980
10/08/79 TIC
Orl.Adv.
1,000.00
106-33
149
8/09/79
Precious Metals
GLP
4,300.00
106-34
03278
11/29/79 TIC
GLP
* 750.00
106-35
CM
9/04/79 TIC
GLP
* 414.44
106-36
#4 2/20/79 Casa Serena
QCNB
45,000.00
106-37
126
3/25/79
Precious Metals
EP Realty
5,000.00
106-38
131
5/18/79 Lake Middlebourne
QCNB
30,000.00
106-39
DM
12/28/79 Tradewinds Trust
QCNB
88,750.00
106-40
03117
11/06/79 TIC
QCNB
2,995.20
106-41
03376
12/12/79 TIC
QCNB
6339.04
*163 1980
Item
Check
Check
Payor/ No.
Number
Date
Drawer Payee
Amount
107-1
1001
1/18/80 Tradewinds Trust
TIC
$ 24,000.00
107-2
1002
1/25/80 Tradewinds Trust
TIC
18,750.00
107-3
589
7/11/80 Lake Middlebourne
TIC
2,000.00
107-4
376
10/17/80 Hamilton Rd. Pshp
TIC
9,750.00
107-5
CM
11/24/80 Fantasyland Trust
TIC
x 26,500.00
107-6
623
7/29/80 Lake Middlebourne
TIC
2,000.00
107-7
53
2/25/80
MLJ Trust
TIC
20,000.00
107-8
543
2/29/80
MLJ Trust
TIC
* 40,000.00
107-9
768
10/03/80
MLJ Trust
TIC
x 10,000.00
107-10
884
11/20/80
MLJ Trust
TIC
x 18,000.00
107-11
122
5/15/80 Fry, (VNB) Az.
TIC
x 10,000.00
107-12
1009
6/03/80 Sports Paradise
TIC
6,000.00
107-13
DM
2/22/80
MLJ Trust
TIC
10,000.00
107-14
DM
5/12/80 Sports Paradise
TIC
x 5,000.00
107-15
1048
6/04/80
Freedom Fuel Corp.
TIC
9,000.00
107-16
1015
2/07/80
Freedom Fuel Corp.
TIC
14,000.00
107-17
1097
7/30/80
Freedom Fuel Corp.
TIC
2,600.00
107-18
1118
9/16/80
Freedom Fuel Corp.
TIC
4,425.00
107-19
132
5/02/80
Leverage Leasing
TIC
9,000.00
107-20
150
5/30/80
Leverage Leasing
TIC
5,000.00
107-21
170
7/21/80
Leverage Leasing
TIC
10,000.00
107-22
171
7/25/80
Leverage Leasing
TIC
14,000.00
107-23
202
10/15/80
Leverage Leasing
TIC
6,500.00
107-24
125
3/07/80
Leverage Leasing
TIC
6,200.00
107-25
05062
3/28/80 TIC
TOA
* 1,600.71
107-26
05084
4/10/80 TIC
TOA
* 1,905.60
107-27
05092
4/04/80 TIC
TOA
* 2,103.88
107-28
05285
5/14/80 TIC
TOA
x 2,000.00
107-29
05362
5/23/80 TIC
TOA
x 2,000.00
107-30
05602
6/20/80 TIC
TOA
x 1,500.00
107-31
04455
10/05/80 TIC
TOA
x 500.00
107-32
04329
9/09/80 TIC
TIC
x 3,200.00
107-33
04355
9/12/80 TIC
TOA
x 2,500.00
107-34
03670
10/03/80 TIC
TOA
x 1,000.00
107-35
03739
11/10/80 TIC
TOA
x 1,000.00
107-36
05989
7/22/80 TIC
TOA
x 1,650.00
107-37
03611
9/24/80 TIC
TIC
1,600.00
107-38
01600
9/16/80 TIC
TIC
1,200.00
107-39
DM
7/11/80
Leverage Leasing
TOA
x 2,000.00
107-40
DM
7/15/80
Leverage Leasing
TOA
x 500.00
107-41
DM
7/11/80
Leverage Leasing
TOA
x 3,000.00
107-42
DM
8/15/80
Leverage Leasing
TOA
x 2,700.00
107-43
131
5/01/80
Leverage Leasing
TOA
3,450.00
107-44
156
6/12/80
Leverage Leasing
TOA
4,000.00
107-45
177
8/04/80
Leverage Leasing
TOA
4,509.90
107-46
179
8/07/80
Leverage Leasing
TOA
6,000.00
107-47
188
8/25/80
Leverage Leasing
TOA
1,000.00
107-48
192
8/28/80
Leverage Leasing
TOA
1,000.00
107-49
219
11/06/80
Leverage Leasing
TOA
6,263.65
107-50
DM
7/11/80
Leverage Leasing
TOA
2,000.00
107-51
DM
7/31/80
Leverage Leasing
TOA
500.00
107-52
1080
7/08/80
Freedom Fuel Corp.
TOA
2,000.00
107-53
428
4/18/80 Tall Timbers
MLJ
2,181.20
107-54
101-A
9/24/80 Fantasyland
MLJ
20,000.00
107-55
107
12/26/80 Fantasyland
MLJ
30,000.00
107-56
366
10/05/80 Hamilton Rd. Pshp
MLJ
22,000.00
107-57
973
8/24/80 Lake Middlebourne
MLJ
156.95
107-58
934
8/27/80 Lake Middlebourne
MLJ
795.00
107-59
1681
10/27/80 Central Ohio Trust
MLJ
1,760.76
107-60
366
11/03/80 Tradewinds Trust
MLJ
330.00
107-61
297
8/28/80 Tradewinds Trust
MLJ
330.00
107-62
565
8/28/80 Tall Timbers Trust
MLJ
1,558.00
107-63
102
11/03/80 Orchard Lakes
MLJ
20,000.00
107-64
132
10/10/80 La Oficina
MLJ
2,500.00
107-65
118
7/25/80 Casa Serena II
MLJ
4,000.00
107-66
#5 11/20/80 Jordan Estates
MLJ
20,000.00
107-67
#6 11/21/80 Jordan Estates
MLJ
18,570.00
107-68
119
7/29/80 Casa Serena II
MLJ
11,000.00
107-69
101
10/03/80 Fantasyland
MLJ
10,000.00
107-70
105
11/03/80 Fantasyland
MLJ
29,700.00
107-71
106
12/08/80 Fantasyland
MLJ
27,000.00
107-72
104
10/24/80
Fantasyland
MLJ
70,000.00
107-73
103
11/14/80 Orchard Lakes
MLJ
35,832.00
107-74
101
12/08/80
Amusement Concepts
lMLJ
15,000.00
107-75
163
6/25/80 TIC
S. Fry
500.00
107-76
04377
9/17/80 TIC
MLJ
* 3,160.00
107-77
06075
8/08/80 TIC
MLJ
* 200.00
107-78
05697
7/02/80 TIC
MLJ
* 500.00
107-79
1126
10/07/80
Freedom Fuel Corp.
MLJ
15,000.00
107-80
169
7/10/80
Leverage Leasing
MLJ
40,000.00
107-81
172
7/28/80
Leverage Leasing
MLJ
20,000.00
107-82
200
10/16/80
Leverage Leasing
MLJ
30,000.00
107-83
211
10/29/80
Leverage Leasing
MLJ
15,000.00
107-84
243
12/04/80
Leverage Leasing
MLJ
20,564.99
107-85
1002
7/03/80 Sports Paradise
MLJ/ML
25,000.00
107-86
DM
2/08/80
MLJ Trust
MLJ/ML
x 30,000.00
107-87
621
5/22/80
MLJ
MLJ/ML
290,039.77
107-88
761
9/24/80
MLJ
MLJ/ML
x 20,000.00
107-89
770
10/03/80
MLJ
MLJ/ML
x 22,000.00
107-90
DM
3/07/80
Freedom Fuel Corp
MLJ/ML
40,000.00
107-91
DM
1/15/80
Freedom Fuel Corp
MLJ/ML
100,000.00
107-92
164
7/03/80
Leverage Leasing
MLJ
30,000.00
107-93
DM
1/29/80
Leverage Leasing
MLJ/ML
x 63,000.00
107-94
1001
1/22/80 Tall Timbers
Orl.Adv.
10,000.00
107-95
03612
9/24/80 TIC
Orl.Adv.
* 1,000.00
107-96
03841
11/29/80 TIC
Orl.Adv.
* 825.00
107-97
03957
12/12/80 TIC
Orl.Adv.
* 2,130.00
107-98
04381
9/17/80 TIC
Orl.Adv.
* 1,500.00
107-99
04484
10/09/80 TIC
Orl.Adv.
* 1,000.00
107-100
04557
10/24/80 TIC
Orl.Adv.
* 1,500.00
107-101
04809
2/23/80 TIC
Orl.Adv.
200.00
107-102
1042
4/23/80
Freedom Fuel Corp.
Orl.Adv.
3,100.00
107-103
DM
2/04/80
Freedom Fuel Corp.
Orl.Adv.
10,000.00
107-104
1009
1/11/80
Freedom Fuel Corp.
Orl.Adv.
5,000.00
107-105
195
9/02/80
Leverage Leasing
Orl.Adv.
2,500.00
107-106
207
10/24/80
Leverage Leasing
Orl.Adv.
1,500.00
107-107
210
10/27/80
Leverage Leasing
Orl.Adv.
3,000.00
107-108
215
11/03/80
Leverage Leasing
Orl.Adv.
4,500.00
107-109
220
11/12/80
Leverage Leasing
Orl.Adv.
4,500.00
107-110
225
11/14/80
Leverage Leasing
Orl.Adv.
3,000.00
107-111
242
12/02/80
Leverage Leasing
Orl.Adv.
1,250.00
107-112
03530
1/24/80 TIC
GLP
* 700.00
107-113
03532
1/11/80 TIC
GLP
* 750.00
107-114
03669
10/03/80 TIC
GLP
* 2,200.00
107-115
03701
10/30/80 TIC
GLP
* 1,719.22
107-116
03765
11/14/80 TIC
GLP
* 1,544.22
107-117
03785
11/22/80 TIC
GLP
* 1,625.49
107-118
03959
12/12/80 TIC
GLP
* 2,538.89
107-119
04029
12/24/80 TIC
GLP
* 1,700.00
107-120
04109
7/24/80 TIC
GLP
* 700.00
107-121
04197
8/22/80 TIC
GLP
* 800.00
107-122
04328
9/09/80 TIC
GLP
* 350.00
107-123
0452-
10/16/80 TIC
GLP
2,155.22
107-124
04786
2/22/80 TIC
GLP
* 700.00
107-125
05066
4/03/80 TIC
GLP
* 700.00
107-126
05103
4/07/80 TIC
GLP
* 1,000.00
107-127
05154
4/18/80 TIC
GLP
* 700.00
107-128
05394
5/29/80 TIC
GLP
* 700.00
107-129
05504
6/12/80 TIC
GLP
* 700.00
107-130
05671
6/26/80 TIC
GLP
* 700.00
107-131
05779
7/11/80 TIC
GLP
* 700.00
107-132
06072
8/07/80 TIC
GLP
* 900.00
107-133
06088
8/22/80 TIC
GLP
* 1,500.00
107-134
192
7/14/80 TIC
GLP
700.00
107-135
CM
5/16/80 TIC
GLP
700.00
107-136
130
5/01/80
Leverage Leasing
GLP
700.00
107-137
1688
10/31/80 Central Ohio Trust
GLC
530.31
107-138
375
10/17/80 Hamilton Rd. Pshp
GLC
755.69
107-139
389
10/31/80 Hamilton Rd. Pshp
GLC
1,047.27
107-140
391
11/14/80 Hamilton Rd. Pshp
GLC
309.40
107-141
1635
10/17/80 Central Ohio Trust
GLC
977.71
107-142
889
11/21/80 TIC
GLC
* 10,000.00
107-143
03668
10/03/80 TIC
GLC
* 4,700.00
107-144
03672
10/30/80 TIC
GLC
* 1,000.00
107-145
03710
10/31/80 TIC
GLC
* 4,784.41
107-146
03808
11/17/80 TIC
GLC
* 4,331.34
107-147
03865
11/28/80 TIC
GLC
2,000.00
107-148
03912
12/08/80 TIC
GLC
* 5,394.77
107-149
03960
12/12/80 TIC
GLC
* 15,000.00
107-150
03999
12/17/80 TIC
GLC
* 1,500.00
107-151
04001
12/17/80 TIC
GLC
10,162.78
107-152
04010
12/22/80 TIC
GLC
5,000.00
107-153
04061
12/26/80 TIC
GLC
* 10,400.00
107-154
04199
8/22/80 TIC
GLC
* 5,800.00
107-155
04390
9/18/80 TIC
GLC
* 4,300.00
107-156
04501
10/15/80 TIC
GLC
* 2,315.77
107-157
04545
10/17/80 TIC
GLC
* 2,405.57
107-158
06078
8/08/80 TIC
GLC
* 7,000.00
107-159
06096
9/14/80 TIC
GLC
* 1,600.00
107-160
03740
11/12/80 TIC
GLC
1,000.00
107-161
864
11/14/80 TIC
GLC
* 3,500.00
107-162
1003
3/07/80 Tradewinds Trust
Lev.Lsg.
x 3,000.00
107-163
210
3/05/80
Precious Metals
Lev.Lsg.
x 19,702.00
107-164
267
10/15/80
Precious Metals
Lev.Lsg.
x 29,000.00
107-165
111
10/30/90 Columbus Game Arcade
QCNB
3,694.00
107-166
161
6/30/80
Leverage Leasing
QCNB
7,273.44
*164 In addition to the transfers denoted above by an asterisk, respondent, on brief, allowed the following transfers. Check
Payor
Date
Drawer
Payee
Amount
10/11/77
LBS
Orl.Adv.
$ 600.00
1/05/78
TIC
FHIS
650.00
12/11/78
MLJ
P. Fry
48.50
3/27/79
FHIS
TOA
3,000.00
12/30/80
TIC
GLP
1,600.00
We have taken these transfers into account where we were able to identify the deposit. The check written on December 30, 1980, does not appear on the 1980 GLP deposit schedule. We conclude the check was deposited in 1981. APPENDIX C The details of respondent's bank deposits analysis work paper schedules are reproduced below. All checks contained in petitioners' Exhibits 104 through 107, as numbered in appendix B, are listed by a notation under the "APPENDIX B ITEM NO." column of the relevant schedule in this appendix. The description for items annotated under the "Transfer From" *165 and "Other Annotation" columns appear on respondent's work paper schedules. Our summary and discussion follows the deposit schedules. CASHIER'S CHECKS 1977
APPENDIX B
ITEM
DATE
PAYEE
AMOUNT
NOTATION
NUMBER
12/28/77
Phillip Fry
1,000.00
Net Cashier's Checks
MLJ TRUST Quaker City National Bank a/c 084-507-3 1977 Deposits APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
02/08/77
6,979.25
02/28/77
59.95
03/14/77
150.00
04/29/77
38.50
05/27/77
20.00 TIC
Ck 1086
104-3
06/03/77
100.00 LBS
Ck 559
104-4
$ 7,347.70 Total Deposits
0.00 Transfers
$ 7,347.70 Deposits per notice of deficiency
TAX INFORMATION CENTER
Quaker National Bank
a/c 099-273-5 1977 Deposits APPENDIX B
DATE
DEPOSIT
TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/10/77
$ 2,100.00
01/13/77
3,876.90
01/21/77
176.20
01/24/77
213.50
01/26/77
246.50
01/27/77
150.55
02/14/77
149.67
03/03/77
452.00
04/04/77
207.00
04/04/77
346.25
05/13/77
800.00
05/17/77
91.34
05/19/77
167.20
05/20/77
481.13
05/23/77
104.00
05/23/77
306.34
05/23/77
356.00
05/25/77
24.25
05/26/77
1,952.50
85
232.85
06/09/77
520.00
104-1
06/22/77
240,84
104-2
07/05/77
99.50
09/06/77
26.75
09/08/77
431.75
09/12/77
345.50
09/12/77
1,000.40
09/13/77
325.20
09/13/77
7,248.24
09/14/77
776.20
09/15/77
63.00
09/16/77
101.55
09/16/77
214.37
09/16/77
1,150.00
09/20/77
222.08
09/20/77
441.24
09/23/77
168.40
09/23/77
269.20
09/23/77
651.75
09/26/77
620.68
09/27/77
52.25
09/29/77
40.00
09/30/77
54.25
09/30/77
4,817.25
10/04/77
339.20
10/05/77
4,130.00
10/07/77
39.50
10/07/77
364.16
10/11/77
220.00
10/11/77
366.25
10/11/77
1,213.50
10/11/77
1,941.75
10/14/77
1,239.75
10/17/77
2,500.00
10/17/77
2,591.65
10/26/77
489.02
10/27/77
2,372.20
10/28/77
893.20
10/31/77
1,500.00
11/02/77
1,140.45
11/04/77
1,520.22
11/07/77
200.25
11/07/77
3,204.35
11/07/77
10,406.75
11/10/77
187.75
11/10/77
214.50
11/14/77
165.89
11/14/77
925.00
11/15/77
74.75
11/16/77
508.40
11/18/77
842.75
11/18/77
2,103.32
11/21/77
403.35
11/21/77
3,596.41
11/23/77
720.65
11/25/77
114.75
11/28/77
139.10
11/28/77
531.50
11/29/77
46.20
12/02/77
115.75
12/05/77
44.45
12/06/77
1,753.95
12/07/77
73.25
12/09/77
154.62
12/12/77
17.75
12/12/77
147.33
12/13/77
6,280.84
12/14/77
1,013.00
12/14/77
1,500.30
12/19/77
102.58
12/19/77
3,663.80
12/19/77
5,174.00
12/22/77
180.00
12/22/77
2,967.45
12/23/77
120.15
12/27/77
1,327.50
$ 104,197.57 Total deposits
0.00 Transfers
$ 104,197.57 Deposits per notice of deficiency
*166 "LET THE PEOPLE KNOW"
LAW BOOK STORE Central National Bank
a/c 04410261
1977 Deposits
01/13/77
247.00
03/18/77
* 3.75
07/04/77
313.75 01/15/77
706.50
03/19/77
385.00
06/04/77
585.00 01/15/77
136.49
03/23/77
* 802.00
06/05/77
680.00 01/17/77
115.00
03/24/77
171.00
06/06/77
237.75 01/19/77
534.39
03/25/77
85.70
06/07/77
590.00 01/23/77
282.00
03/27/77
348.45
06/01/77
565.00 01/24/77
322.50
03/27/77
497.58
07/07/77
* 6.60 01/28/77
1,480.00
03/28/77
37.25
06/08/77
195.50 01/28/77
1,036.50
03/28/77
380.16
06/05/77
1,171.0 01/31/77
110.45
03/29/77
* 226.00
06/04/77
1,680.00 02/01/77
509.41
03/30/77
* 41.50
06/09/77
1,875.00 02/02/77
490.55
03/31/77
* 530.50
05/02/77
41.50 02/03/77
206.75
04/01/77
292.00
06/03/77
* 53.60 02/04/77
153.50
04/04/77
* 40.00
06/10/77
974.00 02/04/77
475.00
04/06/77
871.75
06/10/77
1,247.75 02/05/77
184.00
04/06/77
1,140.00
06/10/77
* 122.65 02/07/77
345.00
04/09/77
1,235.99
06/11/77
119.25 02/11/77
607.77
04/09/77
115.00
06/11/77
47.25 02/12/77
353.45
04/12/77
* 170.70
06/11/77
179.75 02/12/77
175.00
04/13/77
15.00
06/15/77
273.50 02/13/77
56.95
04/13/77
158.00
06/15/77
105.00 02/14/77
283.30
04/14/77
236.50
06/17/77
* 82.40 02/15/77
353.50
04/15/77
* 950.00
06/17/77
455.00 02/17/77
184.00
04/15/77
* 642.55
06/17/77
60.50 02/17/77
513.95
04/18/77
* 422.18
06/20/77
* 1,774.15 02/17/77
366.00
04/18/77
119.50
06/27/77
110.00 02/18/77
227.65
04/20/77
* 526.50
06/27/77
* 75.45 02/20/77
223.50
04/20/77
202.50
06/24/77
234.25 02/20/77
43.09
04/23/77
54.00
06/24/77
46.50 02/22/77
342.50
04/22/77
122.40
06/24/77
75.45 02/23/77
* 544.30
04/27/77
1,419.95
06/27/77
* 1,469.25 02/23/77
77.00
04/25/77
147.50
06/29/77
431.00 02/25/77
261.57
04/27/77
2,641.70
06/29/77
133.50 02/26/77
102.57
03/08/77
100.00
06/29/77
100.00 02/28/77
357.77
04/27/77
383.78
07/02/77
200.50 02/28/77
56.45
04/28/77
77.50
07/13/77
91.01 02/28/77
15.00
04/29/77
82.00
07/02/77
314.25 03/02/77
89.84
05/02/77
* 581.25
07/05/77
65.75 03/03/77
941.50
05/05/77
1,253.00
07/06/77
42.75 03/04/77
921.14
05/05/77
60.00
07/08/77
512.25 03/04/77
41.50
05/05/77
135.01
07/08/77
377.25 03/06/77
1,174.35
05/06/77
* 348.48
07/08/77
223.64 03/07/77
470.00
05/07/77
250.15
07/10/77
317.20 03/08/77
272.00
05/08/77
* 611.00
07/11/77
246.80 03/09/77
140.00
05/11/77
11.75
07/11/77
67.50 03/09/77
141.59
05/13/77
432.04
07/13/77
136.00 03/11/77
* 123.50
05/16/77
* 115.00
07/13/77
75.30 03/12/77
232.05
05/17/77
56.25
07/13/77
28.25 03/14/77
167.00
05/17/77
426.70
07/13/77
89.00 03/15/77
49.51
05/20/77
47.00
07/14/77
n1 956.00 03/15/77
* 500.50
05/26/77
1,983.00
07/15/77
11.50 03/16/80
* 35.80
05/31/77
405.00
07/15/77
52.50 03/17/77
150.00
05/31/77
600.00
07/15/77
88.55 03/22/77
15.50
05/31/77
419.15
07/18/77
* 527.16 03/21/77
56.00
06/02/77
139.50
07/21/77
* 898.01 03/18/77
123.50
06/03/77
* 105.95
07/20/77
* 14.33 07/23/77
113.43
08/18/77
62.00
10/04/77
67.50 07/24/77
1,805.00
08/19/77
296.77
10/07/77
177.50 07/24/77
50.00
08/19/77
* 4,000.00
10/08/77
70.75 07/22/77
56.50
08/16/77
2,190.00
10/;08/77
583.50 07/19/77
20.00
08/23/77
17.72
10/10/77
597.00 07/25/77
* 228.00
08/22/77
230.90
10/11/77
980.00 07/28/77
* 207.25
08/24/77
283.95
10/14/77
475.75 07/27/77
* 46.00
08/26/77
41.40
10/15/77
188.50 07/27/77
36.75
08/29/77
659.50
10/20/77
113.50 07/27/77
10.50
08/29/77
226.50
10/21/77
652.95 07/29/77
* 2,155.00
08/29/77
* 302.35
10/25/77
162.00 08/01/77
709.75
08/29/77
77.00
10/24/77
315.00 08/01/77
45.25
08/31/77
16.75
10/28/77
965.00 07/29/77
16.50
09/01/77
* 80.75
10/28/77
1,242.50 08/03/77
122.00
09/01/77
26.50
11/02/77
118.75 08/08/77
16.75
09/02/77
* 509.45
11/04/77
859.75 08/08/77
* 183.50
09/02/77
17.00
11/05/77
76.00 08/09/77
* 170.00
09/03/77
150.00
11/09/77
138.75 08/10/77
25.00
09/06/77
* 59.02
11/17/77
300.00 08/10/77
* 160.00
09/06/77
61.75
11/18/77
497.75 08/11/77
240.00
09/06/77
215.50
11/28/77
282.25 08/11/77
35.50
09/08/77
* 640.00
11/29/77
41.00 08/11/77
25.50
09/14/77
134.50
11/30/77
162.25 08/12/77
64.00
09/14/77
218.25
11/30/77
70.25 08/05/77
* 108.15
09/16/77
32.25
12/03/77
223.75 08/12/77
* 216.75
09/20/77
214.00
12/11/77
198.50 09/08/77
103.75
09/22/77
548.75
12/12/77
210.00 09/08/77
85.00
09/23/77
1,046.75
12/15/77
528.50 08/15/77
160.00
09/26/77
49.50
12/20/77
99.00 08/15/77
2,610.75
09/28/77
160.50
12/28/77
570.50 09/30/77
94.00
12/30/77
221.75 Deposits
$ 96,909.15 * Cash not deposited 7,195.00 Total Receipts $ 104,104.15 Addition errors (net) (12.00)
Deposits per notice  of deficiency $ 104,092.15 *167 The net addition errors amount shown above reconciles the sum of deposits listed above to the amount of deposits shown on respondent's schedule. ORLANDO ADVERTISING
Quaker City National Bank
a/c 089-810-6
1977 Deposits
APPENDIX B
DATE
DEPOSIT
TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/04/77
600.00
01/04/77
600.00
01/24/77
600.00 LBS
Ck. 136
02/04/77
250.00 LBS
Ck. 170
02/16/77
125.75 LBS
Ck. 201; $ 106.00
02/17/77
120.00
02/24/77
200.00
03/03/77
65.00
03/14/77
5.39
03/16/77
340.00 LBS
Ck. 245
03/24/77
150.00 LBS
Ck. 267
04/14/77
90.00
05/03/77
60.58
05/03/77
159.80
05/09/77
175.00 LBS
Ck. 514
05/23/77
100.00
05/23/77
125.00
05/31/77
500.00 LBS
Ck. 524
06/03/77
800.00 LBS
Ck. 532
06/09/77
300.00 LBS
Ck. 556
06/16/77
500.00 LBS
Ck. 599
06/27/77
500.00 LBS
Ck. 635
08/22/77
1,000.00 LBS
Ck. 799
09/07/77
60.00 LBS
Ck. 809
09/13/77
100.00
09/19/77
500.00
09/26/77
1,200.00 LBS
Ck. 845
10/05/77
600.00 LBS
Ck. 853
10/11/77
300.00
10/11/77
600.00
10/17/77
1,200.00
10/31/77
200.00 LBS
Ck. 867
11/14/77
130.00
11/21/77
250.00
11/30/77
300.00
12/05/77
412.00
$ 13,218.52 Total Deposits
0.00 Transfers
$ 13,218.52 Deposits per notice of deficiency
*168 ORLANDO ADVERTISING AGENCY Quaker City National Bank a/c 089-810-6
1978 Deposits
APPENDIX
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/17/78
400.00 LBS
Ck 896
02/03/78
1,094.00 02/27/78
125.00 03/06/78
500.00 03/13/78
265.00 LBS
Ck 116; $ 250
03/16/78
450.00 105-11
03/22/78
1,000.00 LBS
Ck 103
03/28/78
793.00 03/31/78
810.00 LBS
Ck 109
04/04/78
[497.80]
Cr payment stopped on Ck #1843
05/03/78
500.00 05/08/78
1,000.00 05/11/78
1,000.00 LBS
Ck 156
05/15/78
1,000.00 TIC
05/22/78
237.39 06/02/78
6.80 06/15/78
500.00 LBS
Ck 169
07/03/78
22.10 07/07/78
200.00 08/15/78
1,200.00 08/31/78
1,000.00 TIC
Ck 814
08/31/78
4,000.000 TIC Ck 819
09/15/78
1,500.00 TIC Ck 870
09/15/78
[127.50]
RE
06/15/78
[127.50]
RE
09/15/78
400.89 10/02/78
800.00 TIC
Ck 948
10/10/78
600.00 TIC
Debit Memo
10/16/78
53.99 10/23/78
1,000.00 TIC
Debit Memo
10/27/78
[81.60]
Cr payment stopped
10/27/78
2,096.81 TIC Ck 1042; $ 2,000
11/15/78
20.00 11/17/78
30.05 11/20/78
43.26 12/11/78
525.50 TIC
Ck 1824; $ 500
$ 23,173.79 Total Deposits
16,456.81 Transfers
$ 6,716.98 Deposits per notice of deficiency
*169 Items in brackets [] are not included in the total. FAMILY HEALTH & IMPROVEMENT SOCIETY Quaker City National Bank
a/c 065-513-5
1978 Deposits
APPENDIX
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/05/78
650.00
*
01/09/78
500.00
01/10/78
500.00
01/23/78
1,000.00
01/31/78
25.00
02/03/78
25.00
02/08/78
1,000.00
03/02/78
25.00
03/03/78
150.00
03/08/78
575.00
03/08/78
800.00
03/23/78
325.00
03/23/78
175.00
04/06/78
25.00
04/11/78
2,900.00
105/12
04/24/78
325.00
05/01/78
25.00
05/08/78
150.00
06/02/78
75.00
06/09/78
75.00
06/15/78
1,600.00
07/21/78
300.00
08/04/78
175.00
08/04/78
1,375.00
08/07/78
450.00
08/14/78
200.00
08/25/78
475.00
08/31/78
200.00
09/05/78
200.00
09/11/78
525.00
09/19/78
175.00
09/25/78
650.00
09/30/78
350.00
105-13
10/10/78
200.00
10/16/78
2,200.00
10/27/78
125.00
10/30/78
225.00
11/13/78
325.00
11/13/78
676.00
12/20/78
150.00
$ 19,901.00
Total Deposits
0.00
Transfers
$ 19,901.00
Deposits per notice of deficiency
*170 MLJ TRUST
Quaker City National Bank
a/c 084-507-3
1978 Deposits
APPENDIX
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
02/17/78
300.00 105-5
02/22/78
150.00 02/27/78
6,843.00 03/13/78
35.00 04/26/78
150.00 05/11/78
170.00 LBS
Ck 157
05/23/78
150.00 07/03/78
150.00 07/12/78
700.00 105-6
07/18/78
50.00 07/26/78
300.00 105-7
08/14/78
1,300.00 105-4
08/22/78
300.00 105-8
08/30/78
29.63 08/31/78
200.00 105-9
09/08/78
15.63 09/13/78
300.00 105-10
09/22/78
138.54 10/03/78
300.00 TIC
Ck 962
10/10/78
150.00 10/18/78
9,000.00 11/09/78
37.00 11/22/78
50.00 TIC
Ck 1708
12/11/78
1,048.50 TIC
Ck 1828; 1,000
*
79,950.00 Lake Middlebourne
Ck #3
$ 101,817.30 Total deposits
(1,520.27)
Transfers and transposition error
$ 100,297.03 Deposits per notice of deficiency
CASHIER'S CHECKS
1978
APPENDIX B
ITEM
DATE
PAYEE
AMOUNT
NOTATION
NUMBER
07/08/78
Phillip Fry
* $ 8,222.00 105-14
08/09/78
Phil Fry/MLJ
20,542.99 - Deposit Only/MLJ
10/27/78
Susan Fry
1,760.00 - Pay to IBM Corp.
105-16
12/01/78
Arizona Bank
1,000.00 12/14/78
Phillip Fry
* 10,000.00 105-15
$ 41,524.99 Total checks
(22,302.99)   - Checks with documented source
$ 19,222.00    Cashier's check per notice of
deficiency
*171 TAX INFORMATION CENTER Quaker City National Bank a/c 099-273-5
1978 Deposits
01/03/78
$ 308.50
03/17/78
821.50
05/19/78
449.25
01/04/78
112.22
03/20/78
1,067.25
05/19/78
2,175.50
01/04/78
527.50
03/21/78
460.00
05/22/78
16,218.15
01/04/78
1,000.00
03/21/78
3,105.95
05/23/78
9,806.75
01/06/78
103.25
03/22/78
83.75
05/23/78
10,000.00
01/09/78
25.50
03/22/78
4,025.00
05/24/78
50.75
01/09/78
2,135.25
03/23/78
250.00
05/26/78
583.15
01/10/78
3,306.86
03/24/78
70.75
05/30/78
154.50
01/11/78
1,544.00
03/24/78
1,087.70
06/01/78
12,921.75
01/11/78
8,000.00
03/28/78
1,830.95
06/02/78
1,607.33
01/12/78
117.00
03/28/78
2,936.93
06/02/78
4,200.00
01/13/78
521.00
03/30/78
1,129.35
06/05/78
3,702.00
01/16/78
117.02
03/31/78
10,019.62
06/05/78
11,351.75
01/16/78
236.75
04/03/78
533.44
06/06/78
1,093.20
01/17/78
80.00
04/03/78
2,556.43
06/06/78
3,500.00
01/19/78
715.00
04/05/78
29.00
06/09/78
13,702.05
01/19/78
3,166.00
04/05/78
30.50
06/12/78
1,712.26
01/23/78
2,000.00
04/05/78
250.00
06/13/78
500.00
01/23/78
4,000.00
04/05/78
386.15
06/14/78
1,206.89
01/27/78
58.50
04/05/78
7,197.81
06/15/78
1,900.00
01/27/78
195.00
04/06/78
771.70
06/15/78
2,612.90
01/30/78
379.00
04/10/78
410.00
06/19/78
58.00
01/30/78
2,536.60
04/11/78
103.25
06/19/78
4,722.25
01/31/78
182.50
04/11/78
1,268.00
06/19/78
9,562.50
02/01/78
9,914.66
04/11/78
5,175.32
06/22/78
1,309.00
02/03/78
2,354.10
04/13/78
152.12
06/23/78
10,021.95
02/06/78
123.70
04/13/78
300.00
06/26/78
3,801.35
02/06/78
165.45
04/14/78
100.00
06/29/78
4,922.00
02/08/78
4,336.63
04/14/78
656.10
06/30/78
214.16
02/09/78
221.50
04/17/78
374.93
07/03/78
1,041.70
02/10/78
2,582.05
04/17/78
801.25
07/06/78
2,521.86
02/13/78
136.00
04/17/78
906.09
07/06/78
4,731.50
02/14/78
3,136.25
04/17/78
1,000.00
07/10/78
2,500.00
02/15/78
334.75
04/18/78
2,676.00
07/10/78
4,874.50
02/16/78
48.50
04/19/78
1,803.90
07/10/78
10,501.25
02/17/78
336.45
04/21/78
4,518.89
07/11/78
1,574.75
02/21/78
117.50
04/24/78
81.75
07/12/78
410.50
02/21/78
2,328.00
04/24/78
399.09
07/14/78
339.00
02/23/78
583.00
04/26/78
115.20
07/17/78
500.68
02/23/78
583.00
04/26/78
115.20
07/17/78
500.68
02/23/78
2,358.60
04/27/78
568.75
07/18/78
318.25
02/24/78
2,761.00
04/28/78
1,030.50
07/21/78
2,713.30
02/27/78
3,125.75
04/28/78
2,591.22
07/25/78
1,048.50
02/28/78
9,251.75
05/01/78
2,112.75
07/26/78
889.35
03/02/78
3,162.54
05/03/78
4,176.75
07/26/78
5,022.00
03/03/78
137.25
05/04/78
288.31
07/28/78
2,746.75
03/06/78
1,255.95
05/05/78
4,335.35
07/31/78
981.75
03/06/78
1,902.15
05/08/78
938.14
08/01/78
6,714.50
03/07/78
294.75
05/08/78
1,633.36
08/04/78
621.25
03/08/78
2,548.50
05/10/78
544.10
08/04/78
3,800.00
03/09/78
2,166.75
05/11/78
101.05
08/07/78
3,031.50
03/10/78
1,930.96
05/11/78
368.75
08/09/78
2,615.25
03/13/78
542.61
05/11/78
2,500.00
08/11/78
7,000.00
03/13/78
140.96
05/15/78
449.70
08/14/78
1,592.50
03/13/78
* 8,650.00
05/15/78
637.96
08/14/78
3,530.75
03/14/78
1,125.25
05/16/78
2,979.80
08/15/78
6,071.45
03/15/78
141.25
05/17/80
278.25
08/17/78
6,221.25
03/16/78
1,520.75
05/19/78
319.50
08/18/78
2,708.65
08/21/78
2,411.50
10/12/78
3,249.72
11/17/78
16,746.20 08/21/78
16,400.40
10/16/78
518.25
11/20/78
2,164.55 08/22/78
263.10
10/16/78
1,243.75
11/20/78
5,067.75 08/23/78
1,969.00
10/16/78
12,395.00
11/22/78
5,554.38 08/30/78
8,965.24
10/18/78
n2 9,825.20
11/24/78
7,297.75 08/31/78
2,300.00
10/19/78
2,214.25
11,24.78
56,171.00 08/31/78
7,750.00
10/20/78
n3 1,574.43
11/27/78
5,902.95 09/05/78
200.00
10/23/78
954.00
11/28/78
9,896.52 09/08/78
5,110.50
10/23/78
1,950.00
11/30/78
5,769.00 09/08/78
425.40
10/24/78
2,070.75
11/30/78
12,086.30 09/08/78
3,000.00
10/24/78
4,520.20
12/04/78
4,510.00 09/11/78
236.28
10/26/78
1,214.38
12/04/78
10,020.95 09/12/78
6,448.65
10/27/78
183.50
12/05/78
8,606.25 09/13/78
5,510.50
10/27/78
1,031.00
12/07/78
4,224.54 09/15/78
2,872.28
* 10/30/78
1,000.00
12/11/78
1,047.54 09/18/78
462.95
10/30/78
3,000.00
12/11/78
4,597.00 09/18/78
515.50
10/31/78
22,490.50
12/13/78
4,301.00 09/19/78
230.00
11/02/78
2,746.50
12/13/78
6,012.00 09/19/78
2,833.86
11/03/78
189.38
12/15/78
10,623.05 09/22/78
380.67
11/06/78
2,530.45
12/18/78
3,000.00 09/22/78
3,579.79
11/06/78
2,689.45
12/18/78
4,412.00 09/25/78
10,097.75
11/07/78
18,000.00
12/18/78
5,072.50 09/26/78
6,388.75
11/09/78
204.00
12/20/78
140.00 09/29/78
1,681.15
11/09/78
29,675.00
12/20/78
17,321.18 09/30/78
74.17
11/10/78
7,671.04
12/21/78
3,500.75 10/02/78
10.437.25
11/10/78
11,540.75
12/26/78
110.00 10/03/78
7,201.40
11/13/78
10,679.70
12/26/78
4,399.50 10/05/78
11,386.00
11/13/78
18,275.00
12/27/78
2,500.00 10/10/78
728.75
11/14/78
3,960.00
12/27/78
14,059.00 10/10/78
1,700.25
11/15/78
3,287.77
12/29/78
14,527.60 10/10/78
n1 9,000.00
11/17/78
3,547.50
12/30/78
1,500.00 12/30/78
25,000.00 Total Deposits $ 998,258.62 Transfers (4,000.00)
Addition Errors (2,307.72)
Deposits per schedule $ 991,950.50 Unexplained variance 0.40 Deposits per notice of  deficiency $ 991,950.90 *172 [Footnotes 1, 2, 3 Not on Original]. ORLANDO ADVERTISING AGENCY
Quaker City National Bank
a/c 089-810-6 1979 Deposits APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
02/02/79
[RE 300.00]
02/05/79
500.00 TIC
Ck 1138
02/09/79
250.00 LBS
Ck 644
02/20/79
900.00 03/02/79
5,000.00 106-30
03/20/79
5,000.00 03/27/79
4,000.00 TIC Office Acct
04/06/79
[5,000.00]
Cr. Check Returned
04/09/79
288.80 05/04/79
69.15 05/07/79
123.35 05/18/79
1,000.00 TIC
Ck 1461
05/21/79
114.48 05/23/79
9.78 06/04/79
1,000.00 TIC
Ck 2298
06/06/79
213.10 06/18/79
61.56 07/03/79
[RE 16.57]
07/03/79
[RE 22.52]
07/05/79
[RE 15.68]
07/05/79
[RE 21.24]
07/06/79
300.00 TIC
07/09/79
6.00 07/20/79
4.52 07/30/79
58.54 08/06/79
609.19 08/27/79
6.67 08/29/79
200.00 TIC
Ck 2686
09/07/79
1,000.00 TIC
Ck 2744
09/13/79
200.00 09/14/79
400.00 TIC
CK 2796
09/28/79
1,000.00 106-31
10/09/79
1,000.00 106-32
10/17/79
900.00 Central Ohio #1
Ck 128
10/31/79
2,800.00 Freedom Fuel
11/13/79
3,000.00 TIC
Ck 3128
11/16/79
4,000.00 11/20/79
5,000.00 TIC
Ck 3242
11/27/79
3,000.00 TIC
Ck 3254
12/07/79
3,000.00 TIC
Ck 3348
12/13/79
2,000.00 Freedom Fuel
12/21/79
3,000.00 Freedom Fuel
Ck 1004
12/24/79
3,000.00 Freedom Fuel Ck 1003
$ 53,015.14 Total Deposits
(33,450.00)
Transfers
$ 19,565.14 Deposits per deficiency notice
*173 Amounts in brackets [] are not included in totals. GROUP LEGAL PLAN
Quaker City National Bank a/c 069-195-6 1979 Deposits
APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
04/05/79
2,000.00 FHIS
Ck 156
06/28/79
4,500.00 TIC
Ck 2341
07/12/79
3,350.00 TIC
Ck 2401
07/27/79
3,000.00 TIC
Ck 114; $ 2,000
08/03/79
1,000.00 FHIS
Ck 175
08/03/79
1,000.00 FHIS Ck 177
08/10/79
600.00 FHIS
Ck 178
08/10/79
4,300.00 106-33
09/04/79
414.44 106-34
12/03/79
750.00 106-35
12/12/79
700.00 TIC
Ck 3377
12/21/79
700.00 TIC
Ck 3447
$ 22,314.44 Total deposits
(16,850.00)
Transfers allowed by respondent
$ 5,464.44 Deposits per notice of deficiency
TIC OFFICE ACCOUNT
Quaker City National Bank
a/c 100-181-7 1979 Deposits APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
02/01/79
263.90 02/02/79
3,000.00 TIC
Ck 2022
02/06/79 2,675.00 02/09/79
4,000.00 LBS
Ck 640
03/02/79
25,000.00
106-15
03/21/79
5,000.00 Casa Serena Debit memo
03/21/79
5,800.00 TIC
Ck 101
03/26/79 1,417.53 03/26/79
10,000.00 Precious Metals
106-7, -17
03/27/79 3,000.00 *
03/27/79
720.75 03/31/79
1,739.50 05/21/79 1,000.00 TIC
Ck 1462
06/18/79
[1,000.00]
Credit memo 06/27/79
1,000.00 Lake Middlebourne
Ck 192
106-18
08/07/79 200.00 Lake Middlebourne
Ck 280
08/15/79
500.00 TIC 08/24/79
100.00 TIC
08/27/79
600.00 TIC
Ck 2672
$ 66,016.68 Total Deposits (15,000.00)
Transfers allowed by respondent
$ 51,061.68 Income per notice of deficiency
*174 MLJ TRUST Quaker City National Bank a/c 084-507-3
1979 Deposits APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/10/79
100.00 106-26
02/05/79
135.45 02/07/79
1,000.00
02/28/79
500.00 TIC
Ck 1177
04/16/79
500.00 FHIS
Ck 157
106-23
04/26/79
200.00 106-24
05/01/79
50.00 05/04/79
400.00 106-25
05/07/79
400.00 106-27
05/15/79
100.00 06/07/79
756.74 06/21/79
223.00 07/06/79
330.00 07/16/79
300.00 TIC
Ck 2441
07/20/79
360.00 07/27/79
461.58 08/03/79
1,474.80 08/24/79
130.00 08/27/79
120.69 09/06/79
104.82 09/11/79
300.00
09/17/79
200.00 TIC
Ck 2807
09/24/79
640.00 FHIS
Ck 191
09/26/79
45.00 09/26/79
380.00 106-22
10/04/79
220.50 10/12/79
26.05 10/19/79
300.00 FHIS
11/01/79
77,500.00 Casa Serena ($ 59,300)
106-21, -28, -29
Leverage Leasing (18,200)
11/02/79
170.00 11/05/79
300.00 11/16/79
300.00 11/21/79
400.00 12/04/79
146.54 12/10/79
72.00 12/10/79
150.00 12/12/79
595.17 12/14/79
299.40 12/24/79
1,137.58 $ 90,829.31 Total Deposits
(2,440.00)
Transfers allowed by respondent
$88,389.31 Income per notice of deficiency
*175 TAX INFORMATION CENTER Quaker City National Bank a/c 099-237-5
1979 Deposits
01/04/79
$ 10,000.00
04/23/79
n7 10,000.00
07/05/79
21,223.25
01/10/79
A 9,000.00
04/24/79
9,509.75
07/06/79
173.11
01/17/79
B 6,000.00
04/25/79
482.00
07/06/79
5,000.00
01/22/79
11,711.65
04/26/79
4,800.00
07/06/79
15,575.00
10/31/79
76,340.53
04/27/79
96.46
07/09/79
2,157.00
02/05/79
175.25
04/27/79
856.75
07/09/79
2,839.25
02/05/79
15,470.00
04/30/79
153.50
07/10/79
500.00
02/06/79
1,274.86
04/30/79
257.00
07/12/79
1,829.00
02/07/79
1,569.00
05/01/79
n8 20,815.00
07/12/79
n13 11,200.00
02/07/79
n1 12,052.95
05/04/79
1,115.00
07/13/79
6,129.75
02/09/79
10,299.25
05/04/79
4,578.57
07/16/79
533.00
02/12/79
536.75
05/04/79
10,330.00
07/17/79
1,055.00
02/13/79
17,307.25
05/07/79
202.50
07/17/79
2,886.00
02/15/79
696.50
05/07/79
2,284.90
07/19/79
2,500.00
02/16/79
310.00
05/08/79
380.00
07/19/79
6,000.00
02/20/79
800.00
05/01/79
3,627.97
07/20/79
150.00
02/20/79
2,576.45
05/09/79
722.75
07/20/79
637.50
02/21/79
411.58
05/09/79
1,163.84
07/23/79
1,783.00
02/21/79
25,053.00
05/11/79
6,750.00
07/23/79
2,161.34
02/23/79
680.50
05/11/79
12,161.97
07/25/79
1,260.79
02/26/79
2,677.03
05/14/79
185.50
07/25/79
3,622.50
02/26/79
17,462.00
05/14/79
12,479.04
07/27/79
379.00
02/27/79
4,237.00
05/15/79
2,290.00
07/27/79
n14 10,000.00
02/28/79
1,650.00
05/16/79
2,618.00
07/30/79
1,074.50
03/02/79
1,109.75
05/17/79
345.00
07/30/79
2,543.00
03/07/79
8,750.00
05/18/79
525.75
07/30/79
n15 20,099.50
03/09/79
9,030.75
05/21/79
245.00
08/01/79
8,271.00
03/12/79
39.00
05/21/79
6,595.75
08/02/79
44.00
03/15/79
1,162.74
05/22/79
8,059.27
08/03/79
6,505.50
03/15/79
n2 9,159.41
05/23/79
500.00
08/03/79
6,168.75
03/19/79
n3 1,379.25
05/23/79
n9 11,427.17
08/06/79
1,705.25
03/21/79
n4 5,050.00
05/25/79
9,386.30
08/07/79
229.50
03/21/79
6,253.60
05/25/79
9,817.80
08/07/79
1,036.00
03/26/79
n5 10,000.00
05/31/79
352.79
08/10/79
87.50
03/27/79
4,311.00
06/01/79
n10 40,000.00
08/10/79
150.00
03/28/79
1.50
06/04/79
73.00
08/10/79
209.00
04/02/79
1,272.84
06/04/79
568.50
08/10/79
260.00
04/02/79
6,267.70
06/04/79
1,237.50
08/10/79
685.00
04/05/79
1,705.00
06/04/79
6,143.50
08/10/79
n16 8,149.75
04/09/79
3,917.12
06/05/79
2,233.50
08/15/79
n17 4,000.00
04/09/79
n6 4,659.50
06/05/79
5,380.50
08/17/79
212.75
04/10/79
518.75
06/06/79
656.75
08/17/79
219.00
04/40/79
5,000.00
06/06/79
683.50
08/17/79
n18 3,000.00
04/11/79
62.50
06/06/79
984.00
08/20/79
379.75
04/13/79
232.55
06/06/79
2,163.00
08/21/79
5,068.00
04/13/79
1,117.00
06/07/79
1,250.00
08/24/79
127.80
04/13/79
3,090.00
06/08/79
3,058.50
08/24/79
180.25
04/16/79
716.50
06/08/79
n11 40,000.00
08/24/79
9,118.76
04/17/79
346.25
* * * 06/09/79 through
08/27/79 10,871.00
04/18/79
1,500.00
06/25/79 are missing * *
* * * 08/28/79 through
04/18/79
7,990.34
06/27/79
145.50
10/22/79 are missing * *
04/19/79
50.00
06/27/79
399.00
10/23/79
806.75
04/19/79
206.00
06/27/79
5,000.00
10/23/79
1,645.47
04/20/79
161.50
06/28/79
n12 10,052.50
10/24/79
844.35
04/23/79
67.25
06/29/79
897.50
10/24/79
5,041.50
04/23/79
1,297.50
07/05/79
540.00
10/24/79
13,374.50
04/23/79
7,588.03
07/05/79
5,000.00
10/26/79
4,556.25
10/29/79
8,674.95
11/16/79
2,558.50
12/07/79
8,930.00
10/29/79
18,548.00
11/16/79
12,539.70
12/07/79
11,206.00
10/30/79
2,653.00
11/20/79
6,424.00
12/07/79
12,232.75
10/31/79
1,011.00
11/23/79
8,952.68
12/10/79
5,785.41
11/01/79
3,947.00
11/26/79
5,132.26
12/10/79
13,765.30
11/02/79
3,007.00
11/27/79
8,511.75
12/10/79
39,168.50
11/05/79
2,608.30
11/27/79
15,000.00
12/12/79
77.80
11/05/79
7,146.25
11/28/79
7,586.75
12/12/79
5,176.95
11/06/79
4,044.59
11/30/79
15,339.25
12/14/79
12,426.00
11/06/79
7,117.25
12/03/79
3,212.50
12/18/79
13,076.55
11/08/79
n19 12,052.05
12/03/79
n21 5,000.00
12/18/79
60,888.25
11/09/79
463.00
12/03/79
5,043.75
12/19/79 1,000.00
11/13/79
409.77
12/03/79
8,100.00
12/21/79
14,912.45
11/13/79
21,899.30
12/04/79
2,542.00
12/21/79
28,214.20
11/13/79
n20 25,000.00
12/04/79
7,424.80
* * *12/22/79 through
11/13/79
64,811.50
12/05/79
8,051.31
12/28/79 are missing * *
11/16/79
2,137.50
12/06/79
5,563.65
12/29/79
9,858.50
12/29/79
4,623.75
12/31/79
1,401.16
Total Deposits  $ 1,385,402.77
*176 Add: "Distributions from trusts, partnerships, etc. not reflected in the deposits but verified by credit documents." Appendix B
Item No.
Lake Middlebourne
06/15/79
Debit Memo
20,000.00 106-2
Casa Serena II
09/07/79
Ck. 101
16,900.00 Casa Serena I
09/07/79
Ck. 109
10,000.00 Casa Serena I
09/14/79
Ck. 114
10,000.00 Lake Estates
10/02/79
Ck. 108
8,000.00 La Oficina
10/08/79
Ck. 101
15,000.00 106-12
Casa Serena II
10/10/79
Ck. 103
10,000.00 Central Ohio #1
10/12/79
Ck. 126
10,000.00 Casa Serena II
10/18/79
Debit Memo
15,000.00 Subtotal
$ 1,500,302.77 Transfers
(13,000.00) Income per Deposit    Schedule $ 1,487,302.77  Unexplained variance (.01) Income per notice of    Deficiency $ 1,487,302.76 The following transfers, as numbered below, were included in the deposit above at the corresponding number. The deposits were considered income distributions from the respective trusts to petitioners because the funds were used to pay the personal and business expenses of their proprietorships. APPENDIX
NO.
DRAWER
ANNOTATION
ITEM NO. 1
Lake Middlebourne
Ck. 109; $ 2,031.45
2
Precious Metals
Ck. 121
3
Precious Metals
Ck. 124; $ 610.00
4
Casa Serena II
Debit Memo
5
Precious Metals
Debit Memo
106-7, -16, -17
6
Hamilton Rd. Pshp.
Ck. 126; $ 2,588.62
106-1
7
Casa Serena
Debit Memo
8
Precious Metals
Ck. 130; $ 20,000.00
9
Lake Middlebourne
Ck. 139; $ 10,000.00
10
Lake Middlebourne
Credit Memo
11
Lake Middlebourne
Debit Memo
106-6
12
Lake Middlebourne
Ck. 194; $ 5,000.00
13
Lake Middlebourne
Credit Memo
14
Casa Serena I
Ck. 101
15
Casa Serena I
Ck. 102; $ 15,000.00
16
Precious Metals
Ck. 150; $ 8,000.00
17
Precious Metals
Ck. 153
18
Lake Middlebourne
Ck. 303
19
Freedom Fuel
Ck. 104
20
Casa Serena I
Ck. 108 106-3
21
Freedom Fuel
Ck. 105
*177 From the checks petitioners presented, we have identified the following additional checks deposited in petitioners' accounts. APPENDIX B
DATE
TRANSFERRED FROM
TRANSFERRED TO
AMOUNT
ITEM NUMBER
1/09/79
TIC Office Account
TIC
$ 9,000.00
106-13
1/16/79
TIC Office Account
TIC
6,000.00
106-14
2/13/79
Casa Serena
Fry/TIC
10,000.00
106-8 2/20/79
Casa Serena
Fry/TIC
25,000.00
106-9 4/20/79
Lake Middlebourne
TIC
1,297.50
106-5 4/26/79
Lake Middlebourne
TIC
5,000.00
106-11
12/10/79
Tall Timbers
TIC
5,785,41
106-10
CASHIER'S CHECKS 1979 APPENDIX B
ITEM
DATE
PAYEE
AMOUNT
NOTATION
NUMBER
02/21/79
Phillip Fry
45,000.00 *
Co-endorsed by
F.M., Atty.
106-36
03/02/79
EP Realty
5,000.00 +
106-37
04/20/79
Arizona Bank
5,000.00 05/18/79
Phillip Fry
30,000.00 +
Down Payment on
KIKO acreage
106-38
11/06/79
IBM Corp.
2,995.20 +
106-40
12/07/79
Phillip Fry
134,000.00 +
Down Payment on Tall
Timbers Mobile Home Park
12/10/79
Phillip Fry
129,515.00 Co-endorsed by
E & B, Attys.
12/13/79
Phillip Fry
7,180.91 *
12/28/79
DW Trust A/c
138,000.00 +
106-39
$ 496,691.11  Total cashier's checks
(.01) Unexplained variance
$ 496,691.10  Income per notice of deficiency
*178 GUERNSEY LUMBER COMPANY Quaker City National Bank A/c 069-872-0
1980 Deposits
APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
08/08/80
7,000.00 107-158
08/22/80
5,800.00 107-154
09/15/80
* 4,750.00 MLJ/ML
Ck. 221
09/15/80
1,600.00 107-159
09/19/80
4,300.00 107-155
10/03/80
4,700.00 107-143
10/15/80
2,315.77 107-156
10/17/80
5,160.82 10/31/80
1,000.00 107-144
10/31/80
8,053.94 11/14/80
9,646.72 11/18/80
4,331.34 11/26/80
10,000.00 107-142
12/12/80
15,000.00 107-149
12/15/80
5,394.77 107-148
12/17/80
1,500.00 107-150
12/29/80
10,400.00 107-153
$ 100,953.36 Total deposits
* (4,750.00)
Transfers allowed by respondent
$ 96,203.36 Income per notice of deficiency
MLJ/MERRILL LYNCH ACCOUNT
1980 DEPOSITS
APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/15/80
$ 100,000.00 107-91
02/22/80
126,361.66 03/07/80
40,000.00 Freedom Fuel
Debit memo
107-90
05/14/80
230,000.00 Fry, Az. account
Ck 120
05/20/80
30,000.00 Fry, Az. account
Ck 153
05/22/80
* 290,039.77 107-87
07/03/80
25,000.00 Sports paradise
Ck 1001
107-85
07/03/80
30,000.00 Leverage Leasing
Ck 164
107-92
07/11/80
40,000.00 MLJ Trust
Ck 671
07/28/80
4,000.00 MLJ Trust Ck 682
07/29/80
20,000.00 MLJ Trust Ck 686
07/30/80
11,000.00 MLJ Trust
Ck 686
08/05/80
402.944.31 10/06/80
30,000.00 MLJ Trust
Ck 801
* (290,039.77)
5/22/80 Deposit reversed out
20,724.00 10/27/80 Deposit omitted
$ 1,110,029.97 Total deposits excluding interest
(405,000.00)
Less transfers allowed by respondent
$ 705,029.97 Income per notice of deficiency
10,284.00 Interest earned
$ 715,313.97 Total income deposits
*179 GROUP LEGAL PLAN OF FHIS Quaker City National Bank a/c 069-195-6
1980 Deposits
APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/14/80
$ 750.00 107-113
01/25/80
700.00 107-112
02/08/80
700.00 TIC
Ck 4718
02/22/80
700.00 107-124
03/07/80
700.00 TIC
Ck 4901
03/21/80
700.00 TIC
Ck 5002
04/07/80
700.00 107-125
04/18/80
700.00 107-127
05/02/80
700.00 Leverage Leasing
Ck 130
107-136
05/14/80
221.37 05/16/80
700.00 TIC
107-135
05/30/80
700.00 107-128
06/16/80
700.00 107-129
06/30/80
700.00 107-130
07/11/80
700.00 107-131
07/15/80
250.00 107-134
07/25/80
700.00 107-120
08/08/80
900.00 107-132
08/22/80
800.00 107-121
09/05/80
1,455.22
MLJ/Merrill Lynch
Ck 222
09/09/80
350.00 107-122
09/19/80
2,200.00 10/03/80
2,200.00 107-114
10/16/80
2,155.22 107-123
10/31/80
1,719.22 107-115
11/14/80
1,544.22 107-116
11/26/80
1,625.49 107-117
12/12/80
2,538.89 107-118
12/29/80
1,700.00 107-119
$ 31,709.63 Total deposits
(4,255.22)
Transfers allowed by respondent
$ 27,454.41 Income per notice of deficiency
ORLANDO ADVERTISING
QUAKER CITY NATIONAL BANK
a/c 089-810-6
1980 Deposits
APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/02/80
$ 3,000.00 TIC
Debit memo
01/14/80
5,000.00 Freedom Fuel
Ck. 1009
107-104
01/15/80
380.37 01/21/80
79.80 01/21/80
10,000.00 Tall Timbers
Ck 1001
107-94
02/01/80
177.12 02/04/80
10,000.00 Freedom Fuel Debit memo
107-103
02/06/80
200.00 TIC Ck 4089
107-101
03/10/80
3,000.00 Freedom Fuel
Ck 1034
03/24.80
5,000.00 MLJ/Merrill Lynch
Ck 78
04/04/80
5,000.00 04/08/80
95.73 04/14/80
10,000.00 04/23/80
3,100.00 Freedom Fuel
Ck 1042
107-102
04/28/80
21.78 05/20/80
27.49 06/16/80
1,900.00 MLJ/Merrill Lynch
Ck 148
06/20/80
75.33 07/15/80
108.81 07/15/80
297.18 07/21/80
700.00 MLJ/Merrill Lynch
Ck 180
08/05/80
382.22 09/02/80
2,500.00 Leverage Leasing
Ck 195
107-105
09/17/80
1,500.00 107-98
09/24/80
1,000.00 107-95
10/10/80
1,000.00 107-99
10/17/80
1,516.07 10/21/80
1,500.00 107-100
10/24/80
1,500.00 Leverage Leasing
Ck 207
107-106
10/27/80
3,000.00 Leverage Leasing
Ck 210
107-107
11/03/80
4,500.00 Leverage Leasing
Ck 215
107-108
11/12/80
4,500.00 Leverage Leasing
Ck 220
107-109
11/14/80
3,000.00 Leverage Leasing
Ck 225
107-110
11/18/80
20.22 11/21/80
533.36 11/25/80
825.00 107-96
12/02/80
1,250.00 Leverage Leasing
Ck 242
107-111
12/11/80
2,130.00 107-97
12/22/80
20.22 12/22/80
218.25 12/30/80
76.12 12/31/80
1,600.00 TIC
$ 90,735.07 Total deposits
(31,900.00)
Transfers allowed by respondent
$ 58,835.07 Income per notice of deficiency
*180 TIC OFFICE ACCOUNT
Quaker City National Bank a/c 100-181-7 1980 Deposits APPENDIX B
DATE
DEPOSIT
TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
03/18/80
$ 2,000.00 TIC
Ck 4961
03/24/80
1,047.80 TIC
Ck 4988
03/31/80
1,600.71 107-25
04/08/80
2,103.88 107-27
04/14/80
1,905.60 107-26
40/18/80
3,507.15 TIC
From individual credit items
05/01/80
3,450.00 Leverage Leasing
Ck 131
107-43
06/12/80
4,000.00 Leverage Leasing
Ck 156
107-44
07/08/80
2,000.00 Freedom Fuel Corp
Ck 1080
107-52
07/31/80
5,000.00 Leverage Leasing
Debit Memo
107-51 *
08/04/80
4,509.90 Leverage Leasing
Ck 177
107-45
08/07/80
6,000.00 Leverage Leasing
Ck 179
107-46
08/20/80
1,500.00 Leverage Leasing
Debit Memo
107-50
08/25/80
1,000.00 Leverage Leasing
Ck 188
107-47
08/28/80
1,000.00 Leverage Leasing
Ck 192
107-48
11/06/80
6,263.65 Leverage Leasing
Ck 219
107-49
$ 46,888.69 Total deposits
(8,554.95)
Less Transfers allowed by respondent
$ 38,333.74 Subtotal
.10 Unexplained variance
$ 38,333.84 Income per Notice of Deficiency
Monthly statements for February, May,
June, July, August, September, October,
November, and December were missing.
*181 TAX INFORMATION CENTER
QUAKER CITY NATIONAL BANK a/c 099-273-5 1980 DEPOSITS APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO. * * * * * *
January 1 through January 28 are missing * * * * * * 01/29/80
2,882.07 02/01/80
10,000.00 02/01/80
15,153.50 02/04/80
5,416.00 02/04/80
7,154.50 02/05/08
1,250.00 02/06/80
85.50 02/06/80
171.50 02/06/80
7,500.00 02/07/80
3,567.00 02/07/80
13,700.00 Freedom Fuel Corp
Ck 1015; $ 14,000
107-16
02/08/80
2,601.75 02/11/80
1,387.50 02/12/80
192.00 02/13/80
11,277.75 02/19/80
769.96 02/19/80
12,890.00 02/20/80
9,909.25 02/22/80
366.00 02/22/80
26,579.95 MLJ/Merrill Lynch
Per credit memo
02/25/80
10,000.00 107-13
02/25/80
16,970.58 02/26/80
24,625.42 107-7
02/27/80
1,885.00 02/28/80
1,560.75 02/29/80
185.00 02/29/80
1,071.40 02/29/80
40,000.00 107-8
03/04/80
1,015.00 03/04/80
11,723.78 03/07/80
9,436.25 $ 6,200
107-24
03/10/80
1,769.50 03/10/80
8,075.00 03/11/80
4,547.00 03/14/80
4,118.75 03/17/80
1,980.47 03/17/80
10,093.33 03/18/80
4,294.00 03/19/80
901.25 03/19/80
1,000.00 03/21/80
229.60 03/21/80
1,040.75 03/24/80
1,905.25 03/24/80
2,945.13 03/24/80
26,970.33 03/25/80
1,025.00 03/27/80
3,137.84 03/28/80
1,080.10 03/28/80
[3,616.20]
Credit memo -- not included in total
03/31/80
5,712.00 03/31/80
8,131.63 03/31/80
30,811.16 MLJ/Merrill Lynch
Ck 77; $ 25,000.
04/01/80
2,655.99 04/03/80
1,031.68 04/07/80
510.00 04/07/80
4,268.22 04/08/80
2,067.00 04/09/80
985.00 04/09/80
3,765.00 04/11/80
10,917.50 MLJ/Merrill Lynch
Ck 81; $ 5,000.
04/14/80
687.50 04/14/80
5,000.00 04/15/80
1,020.00 04/15/80
1,500.00 04/16/80
19,186.72 04/18/80
2,510.00 04/18/80
4,000.00 04/18/80
5,564.20
Tall Timbers Trust
Ck 428; $ 2,181.20
04/18/80
10,000 MLJ/Merrill Lynch
Ck 103; $ 10,000.
04/21/80
304.84 04/21/80
1,121.43 04/21/80
1,791.25 04/21/80
3,611.85 04/22/80
4,051.50 04/23/80
1,000.00 04/23/80
2,980.50 04/23/80
4,900.00 04/23/80
5,000.00 04/25/80
4,754.00 04/28/80
119.25 04/28/80
203.52 04/28/80
2,755.09 04/28/80
3,314.46 * * * * * *  4/29 through 5/27 missing
* * * * * *  05/28/80
5,894.00 05/28/80
6,700.00 05/28/80
6,709.21 05/31/80
303.00 05/31/80
1,825.00 05/31/80
5,000.00 Leverage Leasing
Ck 150; $ 5,000.
1Q7-20
06/02/80
3.943.50 06/03/80
5,291.75 06/03/80
8,560.75 Sports Paradise
Ck 1009; $ 6,000
107-12
06/04/80
1,975.00 06/05/80
175.24 06/05/80
905.00 06/05/80
4,250.00 Freedom Fuel
Ck 1048; $ 4,250
06/05/80
11,125.00 $ 9,000
107-15
06/06/80
6,950.00 06/09/80
2,125.00 06/09/80
2,360.00 06/10/80
2,845.08 06/12/80
10,000.00 06/13/80
984.25 06/13/80
20,000.00 06/16/80
17,488.06 MLJ/Merrill Lynch
Ck 146; $ 10,000
06/17/80
500.00 06/19/80
6,293.25 06/19/80
6,809.13 06/20/80
17.00 06/20/80
979.50 06/20/80
2,250.00 06/23/80
3,002.59 06/23/80
3,500.00 06/23/80
12,568.75 06/24/80
2,864.47 06/25/80
2,587.00 06/27/80
1,006.00 06/27/80
10,000.00 06/30/80
9,400.00 06/30/80
16,562.50 07/01/80
5,698.97 07/02/80
2,490.00 07/02/80
7,062.76 07/02/80
21,126.50 MLJ/Merrill Lynch
Ck 165, 169;
$ 20,000
07/07/80
536.50 07/07/80
7,551.00 07/08/80
3,060.99 07/10/80
4,301.83 07/11/80
1,500.00 07/11/80
2,293.33 $ 2,000
107-3
07/14/80
1,106.30 07/14/80
1,062.50 07/15/80
507.00 07/15/80
567.36 07/16/80
5,119.00 07/16/80
20,133.64 MLJ/Merrill Lynch
Ck 178; $ 20,000
07/18/80
6,257.98 07/21/80
1,500.00 07/21/80
3,125.00 07/21/80
4,208.52 07/21/80
4,339.25 07/21/80
10,000 Leverage Leasing
Ck 170; $ 10,000
107-21
07/22/80
2,160.32 07/24/80
2,146.00 07/25/80
500.00 07/25/80
1,040.00 07/25/80
14,000.00 Leverage Leasing
Ck 171; $ 14,000
107-22
07/28/80
6,424.42 07/28/80
11,686.74 07/29/80
9,031.63 $ 2,000
107-6
07/31/80
358.13 07/31/80
5,670.98 Freedom Fuel
Ck 1097; $ 2,600
107-17
08/01/80
1,885.50 08/04/80
8,255.47 08/05/80
1,500.00 08/05/80
6,763.85 MLJ/Merrill Lynch
Ck 187; $ 3,570.98
08/07/80
1,035.00 08/07/80
2,756.23 08/08/80
6,657.00 08/11/80
1,987.66 08/12/80
1,598.00 08/15/80
3,542.75 08/15/80
6,648.55 08/18/80
29,186.52 08/19/80
4,250.00   * * * Deposits from 8/26 through 12/31
08/21/80
4,096.00   were missing * * *
08/22/80
579.13 08/25/80
9,216.35 $ 942.946.69 Deposit subtotal
*182 Add: distributions from trusts, partnerships, and corporations not reflected herein, but respondent verified by credit documents. APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/18/80
$ 24,000.00 Tradewinds Trust
Ck 1001
107-1
01/25/80
18,750.00 Tradewinds Trust
Ck 1002
107-2
05/02/80
9,000.00 Leverage Leasing
Ck 132
107-19
09/16/80
4,425.00 Freedom Fuel Corp.
Ck 1118
107-18
10/15/80
6,500.00 Leverage Leasing
Ck 202
107-23
10/20/80
9,750.00 Hamilton Rd. Pshp
Ck 376
107-4
$ 1,015,371.69 Income subtotal
(128,395.98)
Less transfers allowed by respondent
(4,425.00)
Less FFC transfer
$ 882,550.71 Income per notice of deficiency
MLJ Trust Quaker City National Bank a/c 084-507-3 1980 Deposits APPENDIX B
DATE
DEPOSIT TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/04/80
$ 11,250.00 01/15/80
126.90 02/06/80
844.15 02/08/80
30,000.00 MLJ/Merrill Lynch
107-86
02/20/80
11,110.95 02/22/80
4,500.00 02/22/80
14,800.00 MLJ/Merrill Lynch
02/26/80
20,000.00 MLJ/Merrill Lynch
03/04/80
40,000.00 MLJ/Merrill Lynch
03/12/80
644.60 03/17/80
6,578.00 03/24/80
102.12 04/01/80
94.96 04/03/80
203.90 04/21/80
3,013.95 04/28/80
126.63 05/20/80
25.50 05/20/80
395.61 05/21/80
6.38 05/21/80
324.90 05/23/80
290,039.77 06/02/80
110.77 06/10/80
100.00 06/20/80
29.63 06/26/80
500.00 TIC
Ck 163
107-75
07/02/80
210.00 07/02/80
500.00 107-78
07/08/80
2,608.90 07/10/80
40,000 Leverage Leasing
Ck 169
107-80
07/28/80
4,000.00 Casa Serena
Ck 118
107-65
07/29/80
21.19 07/29/80
85.05 07/29/80
20,000 Leverage Leasing
Ck 172
107-81
07/31/80
11,000 Casa Serene
Ck 119
107-68
08/05/80
200.00 08/08/80
208.96 TIC
$ 200.00
107-77
08/11/80
411.92 08/19/80
72.00 08/26/80
44.11 08/26/80
156.95 Lake Middlebourne
Ck 973
107-57
08/27/80
795.00 Lake Middlebourne
Ck 934
107-58
08/29/80
4,087.60 Tall Timbers Trust
Ck 565; $ 1,558
107-62
Tradewinds Trust
Ck 297; $ 330
107-61
09/05/ 80
104.22 09/05/80
273.00 09/15/80
100.00 09/15/80
3,160.00 107-76
09/17/80
416.37 09/22/80
1,500.00 09/25/80
20,000.00 Fantasyland Trust
Ck 101-A
107-54
10/01/80
4,575.00 10/02/80
10,000.00 Fantasyland Trust
Ck 101
107-69
10/02/80
100.00 10/06/80
22,000.00 Hamilton Rd. Pshp
Ck 366
107-56
10/07/80
2,708.90 10/07/80
15,000.00 Freedom Fuel Corp.
Ck 1126
107-79
10/10/80
2,131.00 10/14/80
2,500.00 La Oficina Trust
Ck 132
107-64
10/14/80
13.50 10/17/80
30,000.00 Leverage Leasing
Ck 200
107-82
10/24/80
70,000.00 Fantasyland Trust
Ck 104
107-72
10/28/80
1,784.10 107-59
10/29/80
15,000.00 Leverage Leasing
Ck 211
107-83
11/03/80
20,200.00 $ 20,000
107-63
11/04/80
330.00 Tradewinds Trust
Ck 366
107-60
11/04/80
29,700.00 Fantasyland Trust
Ck 105
107-70
11/10/80
127.36 11/14/80
750.00 11/14/80
1,511.25 11/14/80
35.832.00 107-73
11/21/80
18.570.00 Jordan Estates
Ck 6
107-67
11/21/80
20,000.00 Jordan Estates
Ck 5
107-66
12/04/80
20,564.99 Leverage Leasing
Ck 243
107-84
12/05/80
213.46 12/11/80
4,700.00 Freedom Fuel Corp.
Ck 1156
12/22/80
132.00 12/22/80
1,144.60 12/29/80
50,000.00 Energy Lodging
Ck 103, 104
Trust
12/29/80
55,000.00 Fantasyland Trust
Ck 107
107-55
Freedom Fuel Corp.
Ck 1162
12/30/80
82.500.00 Capital
Appreciation
$ 1,061.972.15 Total Deposits
(110,000.00)
Transfers allowed by respondent
4,700.00 Add back FFC transfer
$ 956,672.15.00 Income per notice of deficiency
27,000.00 Transfers which did not show up as deposits
27,000.00 Fantasyland Trust
Ck 106
107-71
15,000.00 Amusement Concepts
Ck 101
107-74
*183 TAX INFORMATION CENTER Banc Ohio National Bank
a/c 000012466
1980 Deposits
APPENDIX B
DATE
DEPOSIT
TRANSFER FROM:
OTHER ANNOTATION
ITEM NO.
01/09/80
$ 773.82
01/11/80
1,289.00
01/11/50
754.50
01/14/80
94.50
01/15/80
1,120.78
02/21/80
40.00
01/21/80
1,953.00
01/28/80
1,646.13
02/01/80
1,853.50
02/05/80
489.25
02/05/80
939.00
02/08/80
65.00
02/12/80
2,061.25
02/15/80
873.00
03/03/80
4,099.02
03/07/80
720.87
03/18/80
1,762.50
03/20/80
87.00
03/31/80
914.30
04/04/80
1,732.08
04/07/80
1,185.82
04/16/80
2,115.17
04/21/80
899.42
04/24/80
1,241.89
05/06/80
947.50
05/19/80
637.01
05/20/80
797.75
06/09/80
799.42
06/18/80
400.50
06/20/80
1,318.50
06/24/80
54.25
07/22/80
312.50
08/15/80
292.50
08/20/80
1,124.25
09/09/80
3,200.00
107-32
09/15/80
192.25
09/15/80
663.75
09/16/80
1,200.00
107-38
09/24/80
444.25
09/29/80
1,600.00
107-37
10/08/80
658.00
10/14/80
941.20
10/21/80
1,138.25
10/29/80
90.00
11/03/80
291.50
11/10/80
1,143.42
11/12/80
1,269.30
The January and December bank statements
11/19/80
467.35
were missing, but individual deposit slips
11/28/80
911.61
were available.
12/05/80
2,419.08
12/05/80
1,100.00
12/15/80
1,001.25
12/17/80
2,992.71
12/31/80
900.00
$ 58,018.90
Income per notice of deficiency
*184 CASHIER'S CHECKS
1980
APPENDIX B
ITEM
DATE
PAYEE
AMOUNT
NOTATION/REMITTER
NUMBER
01/03/80
Old Natl Bank
11,679.00 03/07/80
Susan Fry * 532.30 W/drawn from TIC
#4092
03/12/80
Allegheny Bank * 6,355.00 W/drawn from
Increasing
Innovative Income
03/31/80
United Bank * 24,411.78 Precious Metals
03/10/80
VNB Arizona * 10,755.00 Precious metals
06/30/80
Putnam Transfer
+ 7,273.44 107-166
09/16/80
Bank One * 47,933.17 $ 50,000.00
withdrawn
from MLJ/ML-Ck 210
09/18/80
Y&F Auction * 12,500.00 MLJ/ML #235
10/03/80
Y. Trk Sales
14,990.72 10/03/80
S Purcipile
27.50 10/03/80
S Purcipile * 2,750.00 W/drawn from MLJ/ML
#252
10/16/80
Columbus Trlr. * 1,567.50 W/drawn from MLJ/ML
#258
10/24/80
Phillip Fry * 62,080.00 MLJ Trust
10/24/80
D. Transfer
252.28 10/24/80
Booklet Publ.
2,514.37 10/24/80
Curt Kittle * 2,500.00 MLJ Trust
10/29/80
Lwyrs Abstract * 15,000.00 MLJ Trust
10/30/80
H Mini Golf * 3,694.00 Columbus Game Arcade
107-165
12/04/80
Phillip Fry
5,000.00 For Deposit-Playland
Amusement Park
12/04/80
Phillip Fry
1,000.00 For Deposit-Playland
Amusement Park
12/04/80
Phillip Fry
1,000.00 For Deposit-Playland
Amusement Park
12/04/80
Phillip Fry
1,000.00 For Deposit-Playland
Amusement Park
12/04/80
Phillip Fry
1,000.00 For Deposit-Playland
Amusement Park
12/08/80
Phillip Fry
58,587.85 Full Payment-14
107-74
rides
Playland Ocean City
107-51
+ ($ 42,000 substantiated)
12/26/80
Susan Fry
5,000.00 $ 319,403.91 Subtotal
(190,078.75)
* Respondent considered nontaxable
on deposit schedules
2,000.00 Unexplained Variance
$ 131,325.16 Income per notice of deficiency
*185 APPENDIX D The following summaries of operating expenses, by category, are those to which petitioners are entitled. 1977
Expense Category:
TIC
LBS
TOTAL
Advertising
7,608
7,447
15,055
Advertising/Orl. Adv.
8,973
0
8,973
Automobile
192
212
404
Books
11,043
512
11,555
Equip. repair
390
141
531
Freight
31
78
109
Indep. Contractors
8,967
14,047
23,014
Insurance
73
450
523
Meeting Rooms
3,947
3,842
7,789
Office Supplies
4,854
13,076
17,930
Postage
2,083
247
2,330
Reimbursed expenses
492
5,133
5,625
Rent
0
780
780
Repairs & Maintenance
2,1774
695
2,869
Taxes
99
877
976
Telephone
4,211
4,415
8,626
Travel
2,964
5,001
7.965
Utilities
157
961
1,118
Legal Fees
1,050
0
1,050
Miscellaneous
40
828
868
Printing
1,249
0
1,249
Subtotal
$ 60,597
$ 58,742
$ 119,339
Depreciation
19,038
0
19,038
Total
$ 79,635
$ 58,742
$ 138,377
1978
Expense Category:
TIC
LBS
FHIS TOTAL
Advertising
24,486
405
499
25,390
Advertising/Orl. Adv.
13,372
0
0
13,372
Automobile
4,865
0
0
4,865
Books
2,115
563
0
2,678
Freight
23
89
0
112
Indep. Contractors
267,677
13,049
19
280,745
Insurance
2,092
353
0
2,445
Meeting Rooms
4,694
213
0
4,907
Office Supplies
80,906
0
0
80,906
Postage
3,415
250
0
3,665
Rent
8,173
2,155
0
10,328
Repairs & Maintenance
739
430
0
1,169
Taxes
1,177
0
0
1,177
Telephone
50,338
320
0
50,658
Travel
53,737
95
133
53,965
Utilities
1,997
149
0
2,146
Interest
3,542
0
0
3,542
Legal Fees
62,019
0
0
62,019
Miscellaneous
2,657
1,477
0
4,134
Subtotal
$ 588,024
$ 19,548
$ 651
$ 608,223
Depreciation
58,611
0
0
58,611
Total
$ 646,635
$ 19,548
$ 651
$ 666,834
*186 1979
Expense Category:
TIC FHIS TOTAL Advertising
47,693
142
47,835
Advertising/Orl. Adv.
59,789
0
59,789
Automobile
5,265
0
5,265
Books
600
2,253
2,853
Freight
1,824
0
1,824
Indep. Contractors
325,970
7,106
333,076
Insurance
17,251
0
17,251
Meeting Rooms
750
0
750
Office Supplies
170,860
0
170,860
Postage
41
0
41
Rent
16,613
0
16,613
Repairs & Maintenance
754
0
754
Taxes
11,073
0
11,073
Telephone
129,604
0
129,604
Travel
34,834
0
34,834
Utilities
6,067
0
6,067
Interest
19,667
0
19,667
Legal Fees
74,656
1,582
76,238
Miscellaneous
13,341
0
13,341
Wages
90,138
0
90,138
Subtotal
$ 1,026,790
$ 11,083
$ 1,037,873
Depreciation
88,047
0
88,047
Total
$ 1,114,837
$ 11,083
$ 1,125,920
1980
Expense Category:
TIC MLJ IIIM FHIS&GLP
TOTAL Advertising
90,590
5,740
4,293
1,132
101,755
Advertising/Orl. Adv.
92,141
0
0
0
92,141
Automobile
0
400
0
0
400
Books
7,690
494
3,874
0
12,058
Freight
1,073
0
0
0
1,073
Indep. Contractors
497,479
3,654
472
7,924
509,529
Insurance
51,486
0
0
0
51,486
Meeting Rooms
10,683
0
0
0
10,683
Office Supplies
21,943
1,272
0
172
23,387
Postage
65,046
571
0
1,079
66,696
Employee Expense
6,633
0
170
1,772
8,575
Repairs & Maintenance
13,000
0
0
0
13,000
Taxes
2,279
3,159
0
0
5,438
Telephone
185,039
0
0
2,515
187,554
Travel
5,503
213
0
2,003
7,719
Utilities
13,229
1,299
0
0
14,528
Interest
516
0
0
0
516
Legal Fees
15,245
14,800
1,000
22,979
54,024
Miscellaneous
16,036
73
768
453
17,330
Wages
230,117
0
0
0
230,117
Payroll Taxes
30,591
0
0
0
30,591
Subtotal
1,356,319
31,675
10,577
40,029
1,438,600
Depreciation
92,360
0
0
0
92,360
Total
$ 1,448,679
$ 31,675
$ 10,577
$ 40,029
1,530,960
*187 Footnotes
1. Petitioners were represented by counsel throughout the trial of this case. Counsel was permitted to withdraw after trial but before post-trial briefs were due. See Fry v. Commissioner, 92 T.C. 368↩ (1989).
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioners resided in a home on the 120-acre property separate from TIC's buildings. Portions of these 120 acres were later developed by them into an amusement park known as Paradise Lake Amusement Park.↩
4. At the time of the trial of this case, Phillip S. Fry was incarcerated at the Federal Correction Facility in Boron, California. He was convicted upon a guilty plea of conspiracy to defraud the United States in connection with his Freedom Fuel Corporation activities. See infra↩ p. 13.
5. Some of the Fry books were purportedly co-authored by Susan Fry. The titles of those publications include: "Pay No Income Tax Without Going to Jail"; "How to Disinherit The IRS and The Probate Court"; "Our Lady of Perpetual Deductions"; and "How to Cut Your Taxes in Half by Incorporating Your Job or Business."↩
6. A representative agreement is reproduced in appendix A.↩
7. Mrs. Fry's maiden name was Orlando, hence the name Orlando Advertising.↩
8. Petitioners also operated under the following business names, either as an alter ego or as an owner officer. a. Discount Quickprint, Inc., a/k/a Discount Development b. Phillip S. Fry & Associates, Inc.
c. Guernsey Lumber Co. d. Increasing Innovative Income Magazine, Inc. e. Lawyers Publishing Company f. National Council to Eliminate Death Taxes g. Positive Cash Flow Network
h. Sports Paradise Family Entertainment Park i. Talk Magazine j. Tax Counsel, Inc. k. The Energy Store, Inc.↩
9. The entities Mr. Fry organized are referred to by the parties variously as syndicated trusts, syndications, or syndicated entities. For convenience, we adopt their terminology herein.↩
10. The caption on the 1977 MLJ Trust return included losses from partnerships and fiduciaries as one line-item.↩
11. Nonsyndication bank accounts refer to the checking accounts of the nonsyndicated entities, i.e., the entities wholly owned by petitioner.↩
12. During the investigation of petitioners, Mr. Fry filed suit in District Court against Mr. Melaragno in his capacity as a revenue agent for damages allegedly arising out of Mr. Melaragno's attempt to determine petitioners' tax liability.↩
13. For example, one of petitioners' schedules lists "Jordan Estates" as the drawer of checks, drawn and paid by the bank in 1978, which we have listed in appendix B as numbers 105-1 and 105-2. Jordan Estates was not syndicated until 1980. Those checks were drawn on a bank account respondent included in his 1978 bank deposits analysis as belonging to Phillip S. Fry. Further, the account number is different from that shown on checks later identified as drawn on the Jordan Estates checking account during 1980.↩
14. The cashier's check ($ 1,000.00), undocumented deposits ($ 1,014,572.21), prepaid rental from Lake Middlebourne ($ 79,950.00), deposits to the Phillip S. Fry account ($ 9,451.50), Law Book Store bank deposits ($ 80,570.50), and Group Legal Plan deposits ($ 2,000.00) total $ 1,187,544.21.↩
15. Mr. Fry testified the funds were used to purchase land for the Brentwood Southern Mobile Home Park and 126 acres in Ohio in completing the tax free exchange. This same Brentwood Southern Mobile Home Park was the subject of Casa Serena Trusts I and II for which the land was purchased in July 1979.↩
*. The difference in total deposits shown above ($ 3,475,239.46) and the total deposits shown on the table on page 87 ($ 3,525,963.46) is the error adjustments ($ 50,724.00), which do not constitute taxable income.↩
16. The depreciation expense shown in appendix D includes building depreciation which is not in dispute.↩
17. Respondent concedes that petitioners are entitled to investment tax credit for equipment purchased during the years in issue.↩
18. Even if we were to take the losses shown on the face of the returns and financial statements as correct, petitioners would not be entitled to deduct the claimed losses. Although the governing instrument cast the entity in the form of a trust, such form is not controlling for Federal income tax purposes, and it is clear that these entities were not "trusts" for income tax purposes. Morrissey v. Commissioner,296 U.S. 344, 80 L. Ed. 263, 56 S. Ct. 289 (1935); sec. 301.7701-2, Proced. & Admin. Regs. The parties generally agree that the syndicated entities operated as limited partnerships. The parties have not raised, and we need not decide, whether the syndicated entities were partnerships or associations taxable as corporations. The distinction is unavailing in either event. If the syndicated entities were classified as associations taxable as corporations, petitioners did not file a valid subchapter S election to allow the losses to flow through to them. If the syndicated entities were partnerships, petitioners obtained their interests for past and future services and have not demonstrated a tax basis against which to claim the loss. See secs. 705, 721, 722, 742, 1011 et seq. Further, we do not address the issue of whether petitioners received additional income under section 83 for receipt of their interest in the entities they created, which could conceivably supply a partnership basis, because the issue was not raised by the parties.↩
19. The period of limitations does not begin to run until a return is filed. Sec. 6501(a)↩. Petitioners did not file a return for their 1980 taxable year, so the period of limitations remains open for 1980 even in the absence of fraud.
*. Denotes a transfer allowed by respondent on brief.↩
*. Denotes a transfer allowed by respondent on brief.↩
x. Denotes a transfer not included in respondent's deposits analysis.↩
*. Denotes a transfer allowed by respondent on brief.↩
x. Denotes a transfer not included in respondent's deposits analysis.↩
*. Denotes a transfer allowed by respondent on brief.↩
*. Denotes transfer allowed by respondent on brief.↩
*. Denotes a transfer allowed by respondent on brief.↩
*. Only $ 3,000 of the March 13, 1978 deposit was recognized as an interaccount transfer.↩
*. The debit memo dated July 31, 1980, was in the amount of $ 500.00 not $ 5,000.00 as recorded on respondent's schedule. However, because we treat the transfers from Leverage Leasing as loans, and not income, the amount is not significant.↩